1   Parsons Behle & Latimer
    Robert L. Rosenthal, Bar No. 6476
2   Shelley L. Lanzkowsky, Bar No. 9096
    411 E. Bonneville Avenue, Suite 300
3   Las Vegas, NV 89101
    Telephone:    (702) 384-3877
4   Facsimile:    (702) 384-7057

5   Attorneys for Defendants
    Adam S. Kutner, P.C. and Adam S. Kutner
6

7

8                IN THE UNITED STATES DISTRICT COURT

9                    FOR THE DISTRICT OF NEVADA

10

11  VIKKI RALEV,                          Case No. 2:06-CV-1494 (KJD)

12          Plaintiff,                    **MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**

13  v.

14  ADAM S. KUTNER, P.C. and ADAM S.
    KUTNER, individually,                 **ORAL ARGUMENT REQUESTED**
15
            Defendants.
16

17           <u>**MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**</u>

18       Defendants Adam S. Kutner, P.C. and Adam S. Kutner, by and through their counsel of

19  record, Parsons Behle & Latimer, respectfully submit this Memorandum of Point and Authorities

20  In Support Of Defendants' Motion To Disqualify Plaintiff's Counsel.

21

22  / / /

23

24  / / /

25

26  / / /

27
    / / /
28

PARSONS
BEHLE &
LATIMER

1    This Motion is supported by the Declarations of Adam S. Kutner, Edwin Keller, Jr., Patty

2  Gutierrez, Christina Godoy, Veronica Gomez, Cindy Eriksen, and Jerry Donohue, the attached

3  Memorandum of Points and Authorities, the pleadings and papers on file herein, and such

4  argument as may be permitted.

5
     Dated: November 21, 2006                    Parsons Behle & Latimer
6

7

8                                               By:
                                                   Robert L. Rosenthal
9                                                  Bar No. 6476
                                                   Shelley L. Lanzkowsky
10                                                 Bar No. 9096
                                                   Attorneys for Defendants
11                                                 Adam S. Kutner, P.C. and Adam S. Kutner

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I. INTRODUCTION

3

4

5

6

7

8

9

Plaintiff's counsel has engaged in the most egregious of ethical violations. Plaintiff's counsel, Habbas, Bognar & Associates, instructed its client, Lanette Begley (a friend of Plaintiff's, and a former employee of Defendants who now happens to be suing Defendants before the Nevada Equal Rights Commission), to surreptitiously place a tape recorder in Defendants' conference room and secretly tape record a privileged meeting between Defendant Adam Kutner and his attorney Edwin Keller, Jr.

10

11

12

13

During the meeting, Mr. Kutner and Mr. Keller discussed various issues which were clearly intended to remain privileged and confidential. After the meeting, Begley retrieved the tape recorder and she listened to its contents with Plaintiff and her attorneys.

14

15

16

17

18

19

20

By illegally and unethically obtaining what was obviously intended to be privileged information, Plaintiff's counsel now have an unfair advantage in the subject litigation. The taint of the ethical violation must also be imputed to Plaintiff's counsel Daniel Marks because, even if he does not know about the tape recording, and/or has not listened to the tape, whatever knowledge obtained from its contents by Habbas, Bogar & Associates and Plaintiff, must be imputed to Mr. Marks.

21

22

Under the circumstances, disqualification of Habbas, Bognar & Associates and Daniel Marks is absolutely necessary.

23

/ / /

24

/ / /

25

/ / /

26

/ / /

27

/ / /

28

**II.   FACTS**

**A.   ACTIONS BY PLAINTIFF AND DEFENDANTS' OTHER FORMER EMPLOYEES PRIOR TO THE SECRET TAPE RECORDING.**

Plaintiff, Vikki Ralev ("Ralev"), was employed by the law firm of Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm") as an office manager/legal assistant from on or about January 23, 2004, until she voluntarily resigned on August 10, 2005. In January 2006, Ralev then filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission ("NERC"). Plaintiff is currently represented by Habbas, Bognar & Associates ("HBA"), and the Law Office of Daniel Marks. *(Kutner Declaration)*

Barbara Balatbat ("Balatbat"), who began working at the Firm on or about March 1, 2004, voluntarily resigned her employment on June 11, 2005. Thereafter, on November 3, 2005, Balatbat filed a Charge of Discrimination against the Firm with NERC. Like Ralev, Balatbat retained HBA to represent her with respect to her claims against the Firm. *(Kutner Declaration)* Ralev and Balatbat then were able to convince five other employees to file Charges of Discrimination with NERC against the Firm. *(Gutierrez, Gomez, and Godoy Declarations)*

On or about November 29, 2004, Christina Richter ("Richter") was hired as the Firm's bookkeeper/controller. On or about November 21, 2005, Richter voluntarily resigned her employment with the Firm. On February 22, 2006, Ms. Richter filed a Charge of Discrimination against the Firm with NERC, and retained HBA to represent her with respect to her claims against the Firm. *(Kutner Declaration)*

On or about October 6, 2004, Andrea Carrasco-Rivera ("Carrasco-Rivera") was hired as a front office assistant and personal assistant to Mr. Kutner. Carrasco-Rivera voluntarily resigned on or about April 15, 2005. She was then re-hired on or about June 9, 2005 as a front office supervisor, and resigned for a second time on or about July 31, 2005. On April 21, 2006, Carrasco-Rivera filed a Charge of Discrimination against the Firm with NERC, and retained HBA

- 4 -

1  to represent her with respect to her claims against the Firm. *(Kutner Declaration)*

2  On or about October 10, 2005, the Firm hired Portia Barlow ("Barlow"), and she

3  eventually became a disbursal clerk. On June 30, 2006, Barlow voluntarily resigned her

4  employment with the Firm. On September 14, 2006, Barlow filed a Charge of Discrimination

5  against the Firm with NERC, and retained HBA to represent her with respect to her claims against

6  the Firm. *(Kutner Declaration)*

7

8  On or about July 21, 2003, Lanette Begley ("Begley") was hired as a disbursal supervisor

9  at the Firm. On September 25, 2005, Begley was promoted to disbursal manager. On April 28,

10  2006, Begley filed a Charge of Discrimination against the Firm with NERC. On June 12, 2006,

11  Ms. Begley voluntarily resigned her employment with the Firm. At the time Begley filed her

12  Charge of Discrimination with NERC, HBA represented Begley with respect to her claims

13  against the Firm. *(Kutner Declaration)*

14

15  In 5 of the 7 cases, the Nevada Equal Rights Commission has closed the charge, finding

16  that the evidence submitted failed to meet the legal criteria for establishing a violation of the

17  applicable discrimination laws. The 2 remaining cases (Begley and Barlow) are still pending

18  before NERC. *(Kutner Declaration)*

19

20  In January 2006, Begley, who was managing Defendants' Disbursal Department at the

21  time, told her subordinate, Christina Godoy ("Godoy"), that she had retained an attorney and was

22  looking to sue Mr. Kutner for harassment and discrimination. Begley also informed her

23  subordinate, Veronica Gomez ("Gomez"), and Defendants' Legal Assistant/Marketing Director,

24  Patty Gutierrez ("Gutierrez") and that she had retained the same attorney as Plaintiff. *(Gutierrez*

25  *and Gomez Declarations)* Begley told Gutierrez that her attorney had instructed her to keep a

26  daily journal memorializing her conversations with Mr. Kutner, along with the amount of money

27  Mr. Kutner collected on a daily basis. *(Godoy and Gomez Declarations)*

28

PARSONS
BEHLE &
LATIMER

- 5 -

1    Around this time, Begley was in regular contact with Defendant's former employee,

2    Plaintiff, Ralev. *(Gomez Declaration)* Further, from approximately April 2006 until June 12,

3    2006 (Begley's termination date), Begley told Gutierrez on daily basis that she had spoken to

4    Ralev and Balatbat before coming to work each day in order to provide them with an update on

5    the latest events at the office, Mr. Kutner's activities, and the status of their claims against Mr.

6    Kutner. *(Gutierrez Declaration)*

7

8    In early April 2006, Begley called Godoy into her office and informed her that she had

9    met with Kutner's former employees, Ralev, and Balatbat at a local coffee shop to discuss their

10   allegations against Kutner. *(Godoy and Gutierrez Declarations)* Begley said that she had retained

11   the law firm of Habbas & Nasseri (the name of HBA's California office), and that the same law

12   firm was also representing Ralev and Balatbat. Around this time, Begley showed Godoy her

13   attorneys' California website, Habbas, Nasseri & Associates, which listed a 1-800 number.

14   *(Godoy Declaration)*

15

16   In late April 2006, Begley informed Godoy that she had been secretly tape recording her

17   conversations regarding her medical issues with Jerry Donahue ("Donohue"), Kutner's Managing

18   Attorney, and with Office Manager Cindy Eriksen ("Eriksen"). *(Godoy Declaration)* Gomez

19   observed Begley placing the tape recorder in her shoes and pockets on several occasions. *(Gomez

20   Declaration)*

21

22   **B.    THE SECRET TAPE RECORDING.**

23   In May 2006, Begley (who was still working at the Firm), told Godoy that she had filed a

24   complaint with the EEOC, and that Mr. Kutner would be receiving a copy of the complaint any

25   day.   On approximately May 9, 2006, Kutner received a copy of Begley's Charge of

26   Discrimination filed with the Nevada Equal Rights Commission. Upon receipt of the Charge,

27   Kutner notified his attorney, Edwin A. Keller, Jr., from the law firm of Kamer Zucker Abbott.

28

PARSONS
BEHLE &
LATIMER

1  Subsequently, Kutner scheduled a meeting at his office to discuss a number of attorney-client

2  matters, including the claims filed with the Nevada Equal Rights Commission by all claimants,

3  including Ralev. *(Kutner and Keller Declarations)*

4

5      Before the meeting occurred, Begley told Godoy, Gomez, and Gutierrez that she was

6  aware of the pending meeting with Mr. Kutner and his attorney. *(Godoy, Gutierrez, and Gomez*

7  *Declarations)* Begley told Godoy and Gomez that she intended to secretly tape record the

8  meeting. *(Godoy and Gomez Declarations)*

9      Kutner's meeting with Keller was scheduled to occur on May 10, 2006 at 5:30 p.m. in

10 Kutner's main conference room. The day of the meeting, Begley called Godoy into her office

11 and stated once again that she intended to secretly tape record their conversation. At

12 approximately 2:15 p.m., Begley called Godoy back into her office and told her that she could not

13 place the tape recorder in the conference room because her office was too far away, and that it

14 would look suspicious if she was seen near the room. Ms. Begley then asked Godoy if she was

15 willing to place the tape recorder in the conference room where it would not be seen. Godoy told

16 Begley that she did not want to be involved, and did not want any trouble. Begley, who was

17 Godoy's boss, threatened to tell Kutner about some mistakes she had made on a file if she did not

18 help out with the tape recording. Godoy agreed to do as Ms. Begley asked. *(Godoy and Gomez*

19 *Declarations)*

20 *Declarations)*

21

22      Begley told Godoy that she wanted to conduct a test run of the secret tape recording prior

23 to Kutner's meeting. At Begley's instruction, Godoy placed the tape recorder in between books

24 in the conference room and secretly tape recorded a meeting between one of Kutner's employees

25 and a client. After the client meeting was over, Godoy went back to the conference room and

26 closed the door. She retrieved the tape recorder, listened to a portion of the tape, and deleted its

27 contents in order to free up space. *(Godoy Declaration)*

28

PARSONS
BEHLE &
LATIMER

- 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

While still in the closed conference room, Godoy became nervous that the tape recorder would be discovered if it remained in between the books, so she moved the tape recorder above a television set located in an armoir, pushed "record" on the tape recorder, and proceeded to secretly tape record Mr. Kutner's meeting with Mr. Keller. *(Godoy Declaration)*

At approximately 5:30 that evening, Kutner had a closed door meeting with his attorney, Edwin A. Keller, Jr. in the main conference room. Also present at various times were Eriksen, Katrina Cornett, the Firm's Human Resources Manager, and attorney Donohue. The meeting was intended to be privileged and confidential, and it lasted approximately 90 minutes. *(Kutner, Keller, Donahue, and Eriksen Declarations)*

During the course of the confidential meeting, Kutner discussed various privileged and confidential matters. In order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log); but without waiving the attorney client privilege and/or the work product doctrine, they talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with NERC, including: 1) the legal and factual basis for the claims, 2) legal defenses to the claims, 3) possible legal exposure, 4) witnesses, and 5) litigation strategy. *(Kutner, Keller, Donahue, and Eriksen Declarations)*

At no time during the May 10, 2006 meeting was Kutner or anyone present aware that it was being secretly tape recorded. *(Kutner, Keller, Donahue and Eriksen Declarations)*

Later that night, at about 9:30 p.m., Godoy received a message on her telephone answering machine from Begley, asking her to call immediately. Godoy returned the phone call and spoke to Begley. Begley said that she was at Kutner's office to retrieve the secret tape recording, but the tape recorder was not in the bookshelf where it was supposed to be. Begley said she thought someone had discovered the tape recorder. Godoy then informed Begley that she had moved the tape recorder to above the television set because she thought someone would

PARSONS
BEHLE &
LATIMER

1

see it between the books. Several moments later, Ms. Begley, sounding very relieved, said that

2

she had located the tape recorder and was going home to listen to its contents. *(Godoy and*

3

*Gomez Declarations)*

4

C.    **EVENTS AFTER THE MAY 10, 2006 SECRET TAPE RECORDING.**

5

6

While at work the next morning, Begley informed Godoy, Gutierrez, and Gomez that she

7

had listened to the secret tape recording between Kutner and Keller. **Ms. Begley said that she**

8

**had already talked to her attorney about the contents of the secret tape recording and that**

9

**she was in the process of setting up a meeting with her attorney so he could listen to the tape**

10

**recording.** *(Godoy, Gutierrez, and Gomez Declarations)*

11

That same day, Begley told Godoy that she had lied to Donahue and told him that she had

12

13

a doctor's appointment and would be out of the office for several hours, when in reality she

14

would be meeting with her attorney and listening to the secret tape recording. *(Godoy and Gomez*

15

*Declarations)*  Upon Begley's return from her alleged doctor's appointment she also informed

16

Gomez that she had met with her attorney. Begley told Gomez that her attorney had listened to

17

the entire secret tape recording and her attorney advised her not to allow anyone to listen to the

18

secret tape recording, not to talk to anyone regarding the tape, and had ordered Begley to destroy

19

the tape. *(Gomez Declaration)*

20

21

At approximately 9:30 a.m., Godoy told Gutierrez that Begley had secretly tape recorded

22

the entire meeting between Kutner and Keller. **Ms. Godoy stated Begley had been instructed**

23

**by Habbas & Bognar to secretly tape record Mr. Kutner's conversations with his attorney.**

24

*(Gutierrez Declaration)*

25

At about 12:00 p.m., Begley entered Gutierrez' office and confirmed Godoy's earlier

26

comments. Begley boasted to Gutierrez that she had secretly tape recorded the entire conference

27

room conversation the night before. **Begley informed Gutierrez that she and her attorney had**

28

PARSONS
BEHLE &
LATIMER

- 9 -

**listened to the entire tape recording, and were excited about the evidence that they had obtained.** *(Gutierrez Declaration)*

Several hours later, Begley and Gutierrez were both seated in Gutierrez' car out in Defendants' parking lot and they talked about the tape recording. Godoy, saw the two women, walked up to the car's open window, and heard Begley say that her attorneys had listened to the secret tape recording between Kutner and his attorney. Begley then began boasting about the evidence that she had obtained from the secret tape recording, and that her attorney had advised her that they could win an enormous amount of money. Begley also informed Godoy and Gutierrez that they would be able to obtain employment at HBA. *(Godoy and Gutierrez Declarations)*

Later that evening, Begley once again played portions of the tape; this time to fellow employees Liz Cervantes, Portia Barlow, Gomez, and Godoy. As soon as attorney David Fasset exited the building to where we they were all standing, Begley stopped the tape. *(Godoy and Gomez Declarations)*

**Shortly thereafter, Begley informed Gomez that she had met Plaintiff at a local coffee shop, and played the secret tape recording to her.** *(Gomez Declaration)* Begley continued communicating with Ralev and Balatbat on a daily basis during the time Mr. Kutner's meeting was secretly tape recorded, and up and until Begley no longer worked for Mr. Kutner. *(Gutierrez Declaration)*

/ / /

/ / /

/ / /

/ / /

/ / /

PARSONS
BEHLE &
LATIMER

- 10 -

III.   **ARGUMENT**

A.   **THE COURT HAS THE AUTHORITY TO DISQUALIFY PLAINTIFF'S COUNSEL, ABBAS, BOGNAR & ASSOCIATES FROM THE SUBJECT LITIGATION BASED UPON ITS ILLEGAL AND UNETHICAL BEHAVIOR.**

Federal courts have inherent powers to manage their own proceedings and to control the conduct of those who appear before them. Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). By invoking the inherent power to punish bad faith conduct which abuses the judicial process, a court must exercise discretion in fashioning an appropriate sanction. Id. at 44-45, 111 S.Ct. at 2132-33.

District judges have an arsenal of sanctions they can impose for unethical behavior. These sanctions include monetary sanctions, contempt, *and the disqualification of counsel*. In Gas-A-Tron of Ariz. v. Union Oil Co., 534 F.2d 1322 (9th Cir.), the Court recognized that a district court has the primary responsibility for controlling the conduct of the attorneys who practice before it. Id. at 1325; Trone v. Smith, 621 F.2d 994, 999 (9th Cir.1980).

> Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar. The courts, as well as the bar, have a responsibility to maintain public confidence in the legal profession. This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety.

Id. at 1324-25 (quoting Richardson v. Hamilton Int'l Corp., 469 F.2d 1382, 1385-86 (3rd Cir.1972).

The Court in Willmes v. Reno Mun. Court, 59 P.3d 1197 (2002) held that doubts should be resolved in favor of disqualification. Id. To prevail on a motion to disqualify opposing counsel, the moving party must first establish, "...at least a reasonable possibility that some specifically identifiable impropriety did in fact occur and... the likelihood of public suspicion or

PARSONS
BEHLE &
LATIMER

obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." Id.

Additionally, attorney disqualification due to an ethical conflict extends to the entire firm. Adams v. Aerojet-General Corp., 86 Cal. App. 4th 1324, 1333 (2001).  Screening disqualified counsel does not cure a conflict.  Ciaffone v. Dist. Ct., 113 Nev. 1165, 1170 945 P.2d 950 (1997).

Courts must disqualify counsel where necessary to protect the important social policy embodied in confidential communications between a client and a lawyer.  People ex. rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., 20 Cal.4th 1135, 1145-1146 (1999). Although courts must balance a client's right to counsel of his or her choice against the important policies underlying the administration of justice, where those considerations conflict, the administration of justice and the integrity of the bar are paramount interests, and disqualification must follow.  Id. at 1146.

**With these overriding principles in mind, it is exceedingly clear that in this case, the law requires disqualification of HBA, as HBA's conduct was so egregious that not only is disqualification necessary, but disbarment appears warranted as well.**  The Declarations in support of Defendants' Motion establish that on May 10, 2006, HBA instructed its client, Ms. Begley to secretly tape record Mr. Kutner's meeting with management and his attorney.  Further, the evidence demonstrates that HBA and Plaintiff listened to the entire contents of the secret tape recording.

Clearly, the May 10, 2006 meeting was intended to be privileged, as the participants discussed highly confidential issues, including financial exposure, litigation strategy, defenses, and witnesses relating to claimants represented by HBA.  The Declarations of Godoy, Gutierrez and Gomez indicate that Plaintiff's counsel, 1) knew that Kutner would be meeting with his attorney to discuss litigation matters involving all claimants – including Ralev, 2) instructed

Begley to hide a tape recorder in the conference room where Kutner would be having the closed door meeting and record the contents of the discussion, 3) listened to the entire tape recording with Begley , and 4) then ordered Ms. Begley to destroy the secret tape, and not to discuss it with anyone.

## B. PLAINTIFF'S COUNSEL MUST BE DISQUALIFIED FROM THE SUBJECT LITIGATION DUE TO THEIR GROSS ILLEGAL AND UNETHICAL CONDUCT.

The conduct of Plaintiff's counsel in telling their client to secretly tape record what they knew or had to have known was a privileged meeting between Kutner and his attorney was illegal, completely unethical, and "beyond the pale."  Plaintiff's counsel compounded their ethical violations by then meeting with Plaintiff and Begley and listening to the tape recording.  Neither Plaintiff's counsel nor their clients have ever advised Defendants about the tape recording and are clearly trying to use information gleaned during the confidential meeting for an improper tactical advantage.

There has also been an utter lack of candor by Plaintiff's counsel.  HBA had an absolute duty to disclose the secret tape recording; but neither Plaintiff's counsel nor their clients have ever advised Defendants about the tape recording and are clearly trying to use information gleaned during the confidential meeting for an improper tactical advantage.

### 1. Plaintiff's Counsels' Conduct Was Not Only Unethical, It Was Also Illegal Pursuant to NRS 200.650.

Pursuant to NRS 200.650, "…a person shall not intrude upon the privacy of other persons by surreptitiously listening to, monitoring or recording, or attempting to listen to, monitor or record, by means of any mechanical, electronic or other listening device, any private conversation engaged in by the other persons, or disclose the existence, content, substance, purport, effect or meaning of any conversation so listened to, monitored or recorded, unless authorized to do so by one of the persons engaging in the conversation."

PARSONS
BEHLE &
LATIMER

1   NRS 200.690 concerns penalties for which may be imposed for violating Section

2   200.650.

3
> 1.  A person who willfully and knowingly violates NRS
4       200.620 to 200.650, inclusive:
>       (a) Shall be punished for a category D felony as
5       provided in NRS 193.130.
>       (b) Is liable to a person whose wire or oral
6       communication is intercepted without his consent for:
>           (1) Actual damages or liquidated damages of $100
7       per day of violation but not less than $1,000, whichever
8       is greater;
>           (2) Punitive damages; and
9           (3) His costs reasonably incurred in the action,
>       including a reasonable attorney's fee,
10  all of which may be recovered by civil action.

11      At no time did any of the participants engaging in the May 10, 2006 meeting ever consent

12  to being tape recorded. To the contrary, the May 10, 2006 meeting was intended to be privileged,

13

14  as the participants discussed many confidential issues, including financial exposure, litigation

15  strategy, defenses, and witnesses all relating to claimants who have pending litigation against

16  Defendant, and who are currently represented by HBA.  Defendants clearly had a reasonable

17  expectation of privacy when conferring with counsel in a closed door meeting.  By hiding the tape

18  recorder in the conference room, recording the meeting, and not being present during any portion

19  of the meeting, HBA, Plaintiff and Begley violated NRS 200.650 with their unauthorized

20

21  eavesdropping, and must therefore be disqualified from the subject litigation.

22  **2.   Plaintiff's Counsel's Conduct Was Grossly Unethical And Violated The Model Rules Of Professional Conduct .**

23

24      District courts have clear statutory authority to promulgate rules governing the

25  admission and conduct of attorneys who appear before them.  Frazier v. Heebe, 482 U.S. 641,

26  645, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 (1987).  The Model Rules of Professional Conduct,

27  Rule 8.4 discusses an attorney's duty to maintain the integrity of the profession, and states the

28  following:

PARSONS
BEHLE &
LATIMER

- 14 -

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

Rule 3.4 of the Model Rules of Professional Conduct concerns fairness to the opposing party and counsel, and states: "A lawyer shall not: (a) unlawfully obstruct another party' s access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act; (b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."

Model Rule 3.3 states that attorneys have a duty of candor toward the tribunal:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

/ / /

PARSONS
BEHLE &
LATIMER

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

HBA instructed and encouraged the secret tape recording of the May 10, 2006 meeting, and when its client made it aware of the secret tape recording, HBA then set up a meeting to listen to the entire tape and its contents. Once finished listening to Defendants' litigation strategies and defenses, HBA ordered the tape destroyed and further instructed Begley to keep her mouth shut about the secret tape recording.

Therefore, HBA has violated the Model Rules of Professional Conduct by its unauthorized tape recording of attorney-client matters, and by failing to advise Defendants of its clients' illegal activities. Accordingly, HBA must be disqualified as counsel.

/ / /

/ / /

PARSONS
BEHLE &
LATIMER

## C.   BY IMPLICATION, THE LAW OFFICE OF DANIEL MARKS   MUST KNOW THE CONTENTS OF THE SECRET TAPE RECORDING, THUS MUST ALSO BE DISQUALIFIED FROM THE SUBJECT LITIGATION.

Even if Marks did not participate in the secret tape recording and/or did not listen to its contents, by implication, he too must be disqualified by implication.  In Gregori v. Bank of America, 207 Cal.App.3d 291, 300 (1989), the Court held that courts, "…must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings before the court."  Id.

It must be assumed that Plaintiff and/or HBA have discussed this case with Marks. Therefore, all information known to Marks is now tainted by the unethical conduct associated with the contents of the secret tape recording.  It would be impossible to erect a "Chinese Wall" between the illegally obtained information and Marks cannot completely insulate himself from his own client.   Whatever knowledge Plaintiff has gleaned from communications with HBA and/or listening to the secret tape recording directly must obviously be imputed to Marks. The only way to cure the gross misconduct is to remove both HBA and Marks.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PARSONS
BEHLE &
LATIMER

## III.    **CONCLUSION**

Plaintiff's counsel has intentionally obtained privileged information through the most vile means: Instructing their client, a former employee of Defendants' (and a friend of Plaintiff's), secretly tape record  a meeting between Defendant, Adam Kutner, and his attorney, Edwin Keller, Jr. in which they discussed all aspects of the subject litigation.  To make matters worse, Plaintiff's counsel then listened to the secret tape recording, ordered it destroyed and never informed Defendants of its existence.   By taking such obviously unethical actions, Plaintiff's counsel, including Marks, have gained an unfair advantage, and are in a position to exploit Defendants.

Accordingly, opposing counsels' ethical violations require immediate disqualification.


Dated: November 21, 2006                              Parsons Behle & Latimer

                                                      By
                                                        Robert L. Rosenthal
                                                         Bar No. 6476
                                                        Shelley L. Lanzkowsky
                                                         Bar No. 9096
                                                        Attorneys for Defendants
                                                        Adam S. Kutner, P.C. and Adam S. Kutner

PARSONS
BEHLE &
LATIMER

**PROOF OF SERVICE**

I, Barbara Dunn, declare:

I am a citizen of the United States and employed in Clark County, Nevada.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 411 E. Bonneville Avenue, Suite 300, Las Vegas, Nevada  89101.  On November 21, 2006, I served a copy of the within document(s):

MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

☐   by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

☐   by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

| | |
|---|---|
| Daniel Marks, Esq. | Michael J. Bognar, Esq. |
| LAW OFFICE OF DANIEL MARKS | HABBAS, BOGNAR & ASSOC. |
| 302 E. Carson, Suite 702 | 528 S. Casino Center Blvd., 3rd Floor |
| Las Vegas, NV 89101 | Las Vegas, NV 89101 |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of Nevada that the above is true and correct.

Executed on November 21, 2006, at Las Vegas, Nevada.

_____
Barbara J. Dunn

# DECLARATION OF ADAM KUTNER

## DECLARATION OF ADAM KUTNER

I, Adam S. Kutner, declare:

1.      I am the sole shareholder and principal of Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm").

2.      I am an attorney licensed to practice in all the courts of the State of Nevada.

3.      Plaintiff, Vikki Ralev, was employed by the Firm as an office manager/legal assistant from on or about January 23, 2004, until she voluntarily resigned on August 10, 2005.

4.      Plaintiff is currently represented by Habbas, Bognar & Associates, and the Law Office of Daniel Marks to represent her with respect to her claims against the Firm and me personally.

5.      On or about March 1, 2004, I hired Barbara Balatbat as a secretary/receptionist. Ms. Balatbat eventually became the Firm's disbursal manager. On November 3, 2005, Ms. Balatbat filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission. On or about June 11, 2005, Ms. Balatbat voluntarily resigned her employment with the Firm.

6.      I am aware that Ms. Balatbat retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

7.      On or about November 29, 2004, I hired Christina Richter as the office bookkeeper/controller. Subsequently, on or about November 21, 2005, Ms. Richter voluntarily resigned her employment with my Firm. On February 22, 2006, Ms. Richter filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

8.      I am aware that Ms. Richter retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

9.     On or about October 6, 2004, I hired Andrea Carrasco-Rivera as a front office assistant. She resigned on or about April 15, 2005. She was rehired on or about June 9, 2005 as a front office supervisor and resigned for a second time on or about July 31, 2005. On April 21, 2006, Ms. Carrasco-Rivera filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

10.    I am aware that Ms. Carrasco-Rivera retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

11.    On or about October 10, 2005, the Firm hired Portia Barlow and she eventually became a disbursal clerk. On June 30, 2006, Ms. Barlow voluntarily resigned her employment with the Firm. On September 14, 2006, Ms. Barlow filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

12.    I am aware that Ms. Barlow retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

13.    On or about July 21, 2003, I hired Lanette Begley as a disbursal supervisor. She became the disbursal manager on or about September 25, 2005. On April 28, 2006, Ms. Begley filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission. On June 12, 2006, Ms. Begley voluntarily resigned her employment with my Firm.

14.    I am aware that Ms. Begley retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

15.    In each case where there has been a determination issued, the Nevada Equal Rights Commission has closed the charge, finding that the evidence submitted failed to meet the legal criteria for establishing a violation of the applicable discrimination laws. The Charges of

Page 2 of 4

Discrimination filed by Ms. Begley and Ms. Barlow are still pending before the Nevada Equal Rights Commission.

16.    On approximately May 9, 2006, I received a copy of Ms. Begley's Charge of Discrimination filed with the Nevada Equal Rights Commission. Upon receipt of the Charge, I notified my attorney, Edwin A. Keller, Jr. with the law Firm of Kamer Zucker Abbott and scheduled a meeting at my office to discuss a number of attorney-client matters, including Ms. Begley's claims and those of the other claimants.

17.    On May 10, 2006, at 5:30 p.m., I had a closed door meeting with my attorney, Edwin A. Keller, Jr. in the main conference room. Also present at various times were Cindy Eriksen, the Firm's Office Manager/Controller, and Jerry Donohue, the Firm's Managing Partner. The meeting was intended to be privileged and confidential. It lasted approximately ninety minutes.

18.    During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters. Without waiving the attorney client privilege and/or the work product doctrine; but in order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log), we talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for the claims, 2) legal defenses to the claims, 3) possible legal exposure, 4) witnesses, and 5) litigation strategy.

19.    At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and if I had known, I never would have consented to such action.

/ / /

/ / /

Page 3 of 4

20.     Plaintiff's counsel has never contacted me or my counsel to advise me about the secret tape recording.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 20, 2006                By:     _____
                                                Adam S. Kutner

# DECLARATION OF PATTY GUTIERREZ

## DECLARATION OF PATTY GUTIERREZ

I, Patty Gutierrez, declare:

1.      Since April 1998 I have been employed by the Law Offices of Adam Kutner & Associates as a Legal Assistant/Marketing Director.

2.      From 2001 until June 2006 I worked with Lanette Begley, who managed Mr. Kutner's disbursal department.

3.      In or around January 2006, Ms. Begley told me that she and former employee, Vikki Ralev, had retained the law firm of Habbas Bognar & Associates to represent them with respect to claims they had against Mr. Kutner.

4.      From January 2006 until June 2006, Ms. Begley repeatedly told me that she and Ms. Ralev expected to receive millions of dollars in compensation as a result from suing Mr. Kutner, and she often asked if I would join them in their lawsuit. I declined the invitations.

5.      In or around March 2006, Ms. Begley told me that she had been experiencing panic attacks and had a heart condition. Prior to March 2006, Ms. Begley never complained to me about any health problems. Around that time, Ms. Begley also informed me Habbas Bognar & Associates had hired a private investigator to look into the backgrounds of Mr. Kutner and attorney David Fassett, with the law firm of Fassett & Cardoza.

6.      In the latter part of April 2006, Ms. Begley informed me that her attorney had filed a complaint against Mr. Kutner with the EEOC based on sexual harassment and discrimination. Ms. Begley said that she was nervous about whether or not Mr. Kutner would terminate her employment once he received a copy of the complaint.

7.      Two to three days later, Mr. Kutner received a copy of Ms. Begley's EEOC complaint. Ms. Begley told me that Mr. Kutner arranged to have his attorney, Edwin Keller, with

the law firm Kamer, Zucker & Abbott, meet at Mr. Kutner's office two days later in order to discuss the claims filed with the EEOC. Ms. Begley said that the meeting between Mr. Kutner and Mr. Keller was scheduled for 5:00 p.m. in Mr. Kutner's conference room.

8.      On May 10, 2006, at approximately 4:30 p.m. on the day Mr. Kutner was scheduled to meet Mr. Keller, I observed Ms. Begley pacing back and forth in front of the conference room area. Ms. Begley appeared very nervous, and kept entering and exiting my office, which was adjacent to the conference room. At approximately 5:00 p.m., I observed Mr. Kutner and Mr. Keller enter the conference room and shut the door behind them. Several minutes later I left work for the day. I do not know how long the meeting between Mr. Kutner and Mr. Keller lasted.

9.      The following morning, at approximately 9:30 a.m., a fellow employee, Christina Godoy, came into my office and proceeded to inform me that the night before, Ms. Begley had secretly tape recorded the entire meeting between Mr. Kutner and Mr. Keller. Ms. Godoy said that she had listened to the tape recording and could not believe the amount of evidence obtained. Ms. Godoy further told me that Mr. Kutner was going to be "destroyed." Ms. Godoy also stated Ms. Begley had been instructed by Habbas & Bognar to record Mr. Kutner's conversations with his attorney.

10.     Later that day, at approximately 12:00 p.m., Ms. Begley entered my office and boasted that she had secretly tape recorded the entire conference room conversation between Mr. Kutner which took place the night before. Shortly thereafter, Ms. Begley informed me that she and her attorney had listened to the entire tape recording, and were excited about the evidence that they had obtained.

11.    During the month following Ms. Begley's telling me about the secret tape recording, Ms. Begley came into my office on several occasions and said that her attorney intended on going to the media and exposing Mr. Kutner as being racist toward Hispanics.

12.    From approximately April 2006 until June 12, 2006 (the date Lanette Begley quit her job), Ms. Begley came into my office on a daily basis to tell me that she had spoken with Vikki Ralev and Barbara Balatbat before coming to work in order to provide them with an update on the latest events at the office, Mr. Kutner's activities, and the status of their claims against Mr. Kutner.  Ms. Begley's daily reports to me concerning her communications with Ms. Ralev and Ms. Balatbat also took place during the time Mr. Kutner's meeting with Mr. Keller was secretly tape recorded.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _NOV 21, 2006_ , 2006        By: _____
                                              Patty Gutierrez

# DECLARATION OF VERONICA GOMEZ

## DECLARATION OF VERONICA GOMEZ

I, Veronica Gomez, declare:

1.      In August 2005, I began working for the law firm Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm") as a Disbursal Representative, and I continue to be employed in that capacity.

2.      From August 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3.      In early 2006, I overheard several telephone conversations between Ms. Begley and Mr. Kutner's former employee, Vikki Ralev.  At that time, my desk was located adjacent to Ms. Begley's office, and she most always left her door open, and spoke loudly.  Additionally, Ms. Begley personally discussed with me her lawsuit against Mr. Kutner.

4.      Ms. Begley told me that me that Ms. Ralev filed a Complaint with the EEOC against Mr. Kutner and that she was going to receive a large amount of money.   I heard Ms. Begley frequently speak on the phone to Ms. Ralev about Mr. Kutner, including providing her with information regarding Mr. Kutner's office.  Ms. Begley was constantly trying to get other employees to join her campaign against Mr. Kutner.  Ms. Begley eventually asked me to pursue claims against Mr. Kutner, but I responded that I did not have any reason to sue Mr. Kutner.

5.      Prior to Ms. Begley filing her Complaint with the EEOC, she informed me that she had retained the same attorneys as Ms. Ralev and other former employees.  Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, and the dates and times of each conversation.  Ms. Begley told me that she was going to buy a house with the large settlement she received from the "mother fucker."  Also, at this time Ms. Begley instructed me not to work productively on Mr. Kutner's files so his collections would decrease.  I also observed Ms. Begley shredding Mr. Kutner's documents

while laughing aloud. I observed Ms. Begley shredding documents, and various checks which belonged to Mr. Kutner.

6.     In May 2006, I observed Ms. Begley giving her miniature tape recorder to employee Portia Barlow so she could tape record all of her meetings with Mr. Kutner's management. I observed both Ms. Begley and Ms. Barlow placing the tape recorder in their shoes and pockets at various times.

7.     At around the same time, Ms. Begley admitted to me that she wanted to intentionally set her car on fire to get rid of her old car and collect insurance money. Additionally, Ms. Begley informed me that she sued her previous employer for sexual harassment. I was becoming concerned with Ms. Begley's behavior, and tried to avoid getting involved; however, it was hard to avoid overhearing Ms. Begley's plans against Mr. Kutner because of the location of my desk, and she kept insisting on telling me everything.

8.     On May 10, 2006, I heard Ms. Begley tell Christina Godoy that Mr. Kutner, and his management were having a meeting later that evening and that she was not included. I heard Ms. Begley order Ms. Godoy to place the tape recorder in Mr. Kutner's conference room. I also heard Ms. Begley threaten Ms. Godoy that if she did not place the tape recorder in the conference room she would tell Mr. Kutner about a file that Ms. Godoy had made a mistake on, and Ms. Godoy would lose her job. Ms. Godoy then agreed to Ms. Begley's request. Ms. Begley told me that she wanted to secretly tape record the meeting so she could hear what Mr. Kutner intended to do regarding her complaint. Ms. Begley also told me that she was waiting for Mr. Kutner to terminate her because it would be better for her lawsuit against him.

9.     Later that evening, Ms. Begley called my cell phone several times in a state of panic asking me where Ms. Godoy was. I told Ms. Begley I was not aware of Ms. Godoy's

whereabouts.  I then asked Ms. Begley what was wrong, and she told me that she had told Ms. Godoy to place the tape recorder behind the books in Mr. Kutner's conference room, but  she could not locate it.  Further, Ms. Begley told me that was very nervous that someone had found the tape recorder.

10.  The next day, Ms. Begley told Ms. Godoy and I  to come into her office.  Ms. Begley informed us that she had listened to the secret tape, and that she had heard Mr. Kutner's meeting with his attorney, Mr. Keller. Ms. Godoy and I then went into Ms. Begley's office and she asked us to close the door.  Ms. Begley was excited about the contents on the tape, and told us that she had heard Mr. Keller advising Mr. Kutner on the pending lawsuits filed against Mr. Kutner by the group of claimants represented by the same attorney which Ms. Begley had retained. Additionally, Ms. Begley informed me that she heard Mr. Kutner and his attorney discussing possible settlement regarding one of the claimants.  Further, Ms. Begley informed us that she intended to bring the secret tape recording to her attorney to let him listen to its contents.

11.    Ms. Begley told me that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording.  Upon Ms. Begley's return from her alleged doctor's appointment she informed me that she had actually met with her attorney. Ms. Begley told me that her attorney had listened to the entire secret tape recording and her attorney advised her not to allow anyone to listen to the secret tape recording, not to talk to anyone regarding the tape, and ordered Ms. Begley to destroy the tape.

12.    At the close of work that day, Ms. Begley told Ms. Godoy and I to come outside with her and listen to the secret tape recording which she had obtained.  Ms. Begley pressed play, and I  heard Mr. Kutner conversing with his attorney regarding Ms. Begley.  Further, I heard

Case 2:06-cv-01494-KJD-RJJ   Document 4   Filed 11/21/06   Page 33 of 50

settlement discussions concerning another claimant who had also retained the same attorneys as Ms. Begley. Shortly thereafter, we saw attorney David Fasset exiting the building where we were all standing, and Ms. Begley stopped the tape. Ms. Begley had tried on several occasions to play the secret tape recording for Ms. Godoy and I; however, we were always interrupted. Ms. Begley also told me that she had also played the secret tape recording to at least 6 other of Mr. Kutner's employees. Further, I heard Ms. Begley tell one of Mr. Kutner's employees that she had let one of the complainants who had retained the same attorney as Ms. Begley also listen to the secret tape recording.

13.     Shortly thereafter, Ms. Begley informed me that she had met Vikki Ralev at a local coffee shop, and played the secret tape recording to her.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _November 21_, 2006          By: _____
                                         Veronica Gomez

Page 4 of 4

# DECLARATION OF CHRISTINA GODOY

## DECLARATION OF CHRISTINA GODOY

I, Christina Godoy, declare:

1.      On May 5, 2005, I began working for the law firm Kutner & Associates as a Disbursal Representative.   On June 16, 2006, I was promoted to Disbursal Manager, and I continue to be employed in that capacity.

2.      From May 5, 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3.      In January 2006, Ms. Begley told me that she had retained an attorney and was looking to sue Mr. Kutner for harassment and discrimination.  Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, along with the amount of money Mr. Kutner collected on a daily basis.

4.      In early April 2006, Ms. Begley called me into her office and informed me that she met with Mr. Kutner's former employees, Vikki Ralev, and Barbara Balatbat at a local coffee shop to discuss their allegations against Mr. Kutner.  Ms. Begley said that she had retained the law firm of Habbas & Nasseri, and that the same law firm was also representing Ms. Ralev and Ms. Balatbat.  Ms. Begley then told me that she intended to file harassment and discrimination claims against Mr. Kutner with the EEOC.  Ms. Begley claimed that her attorneys were "big," and that her case against Mr. Kutner would be "big money."  Additionally, Ms. Begley claimed that she was aware of several people who were filing similar claims against Mr. Kutner, and that they intended to file a class action  lawsuit.  During the same conversation, Ms. Begley maintained that she knew all about Mr. Kutner's insurance coverage regarding employee complaints.  Ms. Begley, who knew that I had previous insurance coverage experience, then asked me whether or not Mr. Kutner's insurance coverage was capped, and what amount of

funds could someone receive if a lawsuit was filed against Mr. Kutner for harassment and discrimination. At that time, Ms. Begley requested that Veronica Gomez, Portia Barlow, Kenia Onofre, and myself provide affidavits regarding how Mr. Kutner treated Ms. Begley. I told Ms. Begley that I would not provide her with an affidavit because her contentions were not true. I advised Ms. Begley to think about what she was doing, and that she should think of her family.

5.     After Ms. Begley informed me that she was going to file a lawsuit against Mr. Kutner, she began complaining to me on a daily basis about Mr. Kutner's behavior. I told Ms. Begley that if she did not like it, she should work somewhere else. Ms. Begley responded that she was going to stay until Mr. Kutner was forced to fire her.

6.     In mid April 2006, Ms. Begley asked Veronica Gomez, Kenia Onofre, and Portia Barlow and myself if we intended to join her in filing a complaint against Mr. Kutner. I told Ms. Begley that I had no intention of filing a complaint against Mr. Kutner. I do not know how Ms. Gomez, Ms. Onofre, or Ms. Barlow responded to Ms. Begley's question.

7.     Shortly thereafter, Ms. Begley told me that she was intentionally refusing to turn in her disbursal sheets to Mr. Kutner (as was customary), in an attempt to upset Mr. Kutner and force him to terminate her employment. Around this time, Ms. Begley showed me her attorneys' California website, Habbas, Nasseri & Associates, which listed a 1-800 number.

8.     In late April 2006, Ms. Begley informed me that she had been secretly tape recording her conversations regarding her medical issues with Jerry Donahue, Mr. Kutner's Managing Attorney, and with Office Manager, Cindy Erickson.

9.     In May 2006, Ms. Begley informed me that she had filed a complaint with the EEOC, and that Mr. Kutner would be receiving a copy of the complaint any day.

10.     Several days later, Ms. Begley said that Mr. Kutner had received a copy of her EEOC complaint. Ms. Begley angrily told me that Mr. Kutner told her that he would no longer conduct meetings with her without other individuals being present.

11.     Shortly after Ms. Begley informed me that Mr. Kutner had received a copy of her EEOC complaint, she told me that Mr. Kutner had scheduled a meeting with his attorney, Ed Keller, to discuss the EEOC charges filed against him. Ms. Begley said that she intended to secretly tape record Mr. Kutner's meeting with his attorney.

12.     Around this time, Ms. Begley also informed me that she had played the secret tape recording of her conversations with Jerry Donahue and Ms. Erickson to her attorney. Ms. Begley played a portion of a tape recording between Mr. Donohue and Ms. Begley, and I heard Mr. Donahue discussing Ms. Begley's performance issues in a very professional manner. I also heard Mr. Donahue advising Ms. Begley of her rights to seek FMLA protection if her health issues were a concern.

13.     On May 10, 2006, Mr. Kutner was scheduled to meet with his attorney, Mr. Keller, Ms. Begley called me into her office. Ms. Begley said that Mr. Kutner was going to meet Mr. Keller at 5:30 p.m. in Mr. Kutner's conference room. Ms. Begley stated once again that she intended to secretly tape record their conversation. At approximately 2:15 p.m., Ms. Begley called me into her office and told me that she could not place the tape recorder in the conference room because her office was too far away, and that it would look suspicious if she was seen near the room. Ms. Begley then asked me if I would be willing to place the tape recorder in the conference room on the bookshelf where it would not be seen. I told Ms. Begley that I did not want to be involved, and did not want any trouble. Ms. Begley proceeded to threaten to go to Mr. Kutner and tell him about some mistakes I had made on a file. Ms. Begley then repeated her

request and asked me to place the tape recorder in the conference room as a personal favor to her. I agreed to do as Ms. Begley asked.

14.     Ms. Begley proceeded to show me the tape recorder, which was digital, and which was apparently capable of recording up to 4 hours of conversation. Ms. Begley showed me how to turn the tape recorder on and also instructed me how to delete portions of prior recordings so that I would have enough "tape" to record Mr. Kutner's and Mr. Keller's entire conversation.

15.     Ms. Begley said that she wanted to conduct a test run of the secret tape recording prior to Mr. Kutner's and Mr. Keller's meeting. Ms. Begley stated that employee Liz Cervantes, was scheduled to meet with one of Mr. Kutner's clients in the conference room in fifteen minutes, and she instructed me to secretly tape record their meeting.

16.     I then went to Mr. Kutner's conference room and placed the tape recorder between books on a bookshelf. I pushed the record button, and went back to my office awaiting the conclusion of Ms. Cervantes' meeting.

17.     Approximately 35 minutes later, Ms. Begley called me on my office phone from her office and informed me that Gabriella Perez conducted the client meeting instead of Ms. Cervantes. Ms. Begley said that she saw Ms. Perez leave the conference room, and instructed me to retrieve and listen to the recording to ensure that the recorder clearly picked up the conversation.

18.     I then went back to the conference room and closed the door. I retrieved the tape recorder and pushed the play button and heard Ms. Perez's voice. I then deleted the contents of the recording in order to free up space and record Mr. Kutner's and his attorney's meeting.

19.     While still in the closed conference room, I became nervous that the tape recorder would be discovered if it remained in between the books, so I moved the tape recorder above a

television set located in an armoir, pushed "record" on the tape recorder, and proceeded to secretly tape record Mr. Kutner's meeting with his attorney, Mr. Keller. I then went back to my office, and I left work for the day at approximately 5:15 p.m. that evening.

20. Later that night at about 8:30 p.m., I received a message on my telephone answering machine from Ms. Begley, asking me to call her immediately. Ms. Begley sounded panicked and upset. I immediately returned Ms. Begley's call. Ms. Begley said that she was at Mr. Kutner's office to retrieve the secret tape recording, but the tape recorder was not in the bookshelf where it was supposed to be. Ms. Begley said that she believed someone had discovered the tape recorder. I then informed Ms. Begley that I had moved the tape recorder to above the television set because I thought someone would see it between the books. Several moments later, Ms. Begley, sounding very relieved, said that she had located the tape recorder and was going home to listen to its contents.

21. While at work the next morning, Ms. Begley informed me that she had listened to the secret tape recording between Mr. Kutner and his attorney, Mr. Keller. Ms. Begley said that she had already talked to her attorney about the contents of the secret tape recording and that she was in the process of setting up a meeting with her attorney so he could listen to the tape recording. Ms. Begley stated that her attorney had advised her not to let anyone else listen to the tape. Ms. Begley also told me that she had informed her attorney that I placed the tape recorder in the conference room.

22. That same day, Ms. Begley said that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording.

23.     Several hours later Ms. Begley returned to work. I then observed Ms. Begley in the parking lot sitting in Patty Gutierrez's car talking. I walked up to Ms. Gutierrez's car where the window was rolled down and listened to their conversation. I heard Ms. Begley tell Ms. Gutierrez that her attorneys had listened to the secret tape recording between Mr. Kutner and his attorney. At that time, Ms. Gutierrez asked me if I was the one who put the tape recorder in the conference room, and I said yes. Ms. Begley told me that the tape recording contained the entire conversation between Defendant and his attorney addressing her claims. Ms. Begley then began boasting to me about the evidence that she had obtained from the secret tape recording of Defendant and his attorney, and that her attorney had advised her that they could win an enormous amount of money hands down. Ms. Begley also informed myself and Ms. Gutierrez that we would be able to obtain employment with her attorney at the law firm of Habbas & Bognar.

24.     Later that evening, Ms. Begley told Liz Cervantes, Portia Barlow, Veronica Gomez, and I about the secret tape recording that she and her attorneys had obtained. Ms. Begley boasted that her possible damages would not be capped and she could receive millions of dollars. Additionally, Ms. Begley told Ms. Gomez and I to come outside with her and listen to the secret tape recording which she had obtained. We proceeded outside of Mr. Kutner's office and listened to the tape. I heard Cindy Erickson discussing Ms. Begley's issues with Mr. Kutner's attorney, including settlement possibilities. I also heard Mr. Kutner conversing with his attorney regarding Ms. Begley. As soon as attorney David Fasset exited the building to where we were all standing, Ms. Begley stopped the tape.

25.     Shortly thereafter, Ms. Begley informed me that her attorneys had prepared a letter of resignation, and that her attorneys told her that she could present it to Mr. Kutner when

she was ready.  Ms. Begley told me that she intended to quit while I was on vacation in an attempt to cause Mr. Kutner problems with his collections.  I informed Mr. Kutner of Ms. Begley's intentions, and prior to my leaving on vacation, I prepared all of the pending accounts to avoid any problems in the event of Ms. Begley's departure.  Upon return from my vacation, I learned that Ms. Begley had submitted her resignation while I was away.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: ___11|00|___, 2006                By: _____
                                             Christina Godoy

# DECLARATION OF CINDY ERIKSEN

## DECLARATION OF CINDY ERIKSEN

I, Cindy Eriksen, declare:

1.      At all relevant times I have been employed as the Office Manager at Kutner & Associates.

2.      This Declaration shall not be construed as a waiver of the attorney client privilege and/or the work product doctrine.

3.      On approximately May 8, 2006, Mr. Kutner advised me to attend a closed door meeting on May 10, 2006, at 5:30 p.m. with Mr. Kutner, his attorney, Ed Keller, and Managing Partner, Jerry Donohue.

4.      On May 10, 2006, at 5:30 p.m., I attended the closed door meeting in Mr. Kutner's office conference room.  The meeting between the four of us was intended to be privileged and confidential.  The meeting lasted approximately 90 minutes.

5..      During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters.  In order to provide the Court with a general sense of the privileged nature of the meeting, we talked about many issues concerning all of the claimants who filed claims with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for all claims, 2) possible exposure, 3) settlement, and 4) litigation strategy.

/ / /

/ / /

/ / /

/ / /

/ / /

6.     At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and had I known, I never would have consented to such action.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _Nov. 21_, 2006                    By: _Cindy Eriksen_
                                                Cindy Eriksen

# DECLARATION OF EDWIN KELLER, JR.

## DECLARATION OF EDWIN KELLER, JR.

I, Edwin A. Keller, Jr., declare:

1.      I am an attorney and shareholder at the law firm of Kamer Zucker Abbott.  I am licensed to practice in all the courts of the State of Nevada.  At all relevant times, I represented Adam S. Kutner, P.C. with respect to employment law matters.

2.      This Declaration is not intended to create and shall not be construed as a waiver of the attorney-client privilege and/or the work product doctrine.

3.      On May 10, 2006, at 5:30 p.m., I attended a closed door meeting at Mr. Kutner's office in the main conference room with Adam Kutner; Cindy Erickson, Office Manager/Controller; Katrina Cornett, Human Resources Manager; and Jerry Donohue, Managing Partner in attendance at various times.  The meeting was intended to be privileged and confidential.  The meeting lasted approximately ninety (90) minutes.

4.      During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters.  In order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log), we talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with the Nevada Equal Rights Commission, including: (1) the legal and factual basis for the claims; (2) legal defenses to the claims; (3) possible legal exposure; and (4) litigation strategy.

5.      At no time during the May 10, 2006 meeting was I aware that it was being tape recorded.  Additionally, at no time did I consent to the recording of any conversation or meeting that I had related to the representation of Adam S. Kutner, P.C.

The foregoing is based upon my personal knowledge and recollection. If called to testify, I

could and would competently testify thereto. Pursuant to 28 U.S.C. § 1746, I hereby certify under

penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2006                    By:

Edwin A. Keller, Jr.

# DECLARATION OF JERRY DONOHUE

### DECLARATION OF JERRY DONOHUE

I, Jerry Donohue, declare:

1.    At all relevant times I was employed as the Managing Attorney at Kutner & Associates.

2.    This Declaration shall not be construed as a waiver of the attorney client privilege and/or the work product doctrine.

3.    On approximately May 8, 2006, Mr. Kutner advised me to attend a closed door meeting on May 10, 2006, at 5:30 p.m. with Mr. Kutner, his attorney, Ed Keller, and Office Manager, Cindy Eriksen.

4.    On May 10, 2006, at 5:30 p.m., I attended the closed door meeting in Mr. Kutner's office conference room. The meeting between the four of us was intended to be privileged and confidential. The meeting lasted approximately 90 minutes.

5..    During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters. In order to provide the Court with a general sense of the privileged nature of the meeting; but without waiving the attorney client privilege and/or the work product doctrine, we talked about many issues concerning all of the claimants who filed claims with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for all claims, 2) possible exposure, 3) settlement, and 4) litigation strategy.

6.    At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and had I known, I never would have consented to such action.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Dated: *Nov. 20*, 2006

By: _____
      Jerry Donohue