1   Parsons Behle & Latimer
    Robert L. Rosenthal, Bar No. 6476
2   Shelley L. Lanzkowsky, Bar No. 9096
    411 E. Bonneville Avenue, Suite 300
3   Las Vegas, NV  89101
    Telephone:    (702) 384-3877
4   Facsimile:    (702) 384-7057

5   Attorneys for Defendants
    Adam S. Kutner, P.C. and Adam S. Kutner
6

7

8                  IN THE UNITED STATES DISTRICT COURT

9                      FOR THE DISTRICT OF NEVADA

10

11   VIKKI RALEV,                          Case No.  2:06-CV-1494 (KJD)

12            Plaintiff,                    **MOTION FOR TERMINATING
                                            SANCTIONS DUE TO BAD FAITH
13   v.                                     CONDUCT**

14   ADAM S. KUTNER, P.C. and ADAM S.
     KUTNER, individually,,
15                                          **ORAL ARGUMENT REQUESTED**
             Defendants.
16

17   ## MOTION FOR TERMINATING SANCTIONS DUE TO BAD FAITH CONDUCT

18        Defendants Adam S. Kutner, P.C. and Adam S. Kutner, by and through their counsel of

19   record, Parsons Behle & Latimer, respectfully submit this Memorandum of Point and Authorities

20   In Support Of Defendants' Motion For Terminating Sanctions pursuant to the Court's inherent

21   power to sanction due to Plaintiff's bad faith conduct.
22

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28

PARSONS
BEHLE &
LATIMER

1    This Motion is supported by the Declarations of Adam S. Kutner, Edwin Keller, Jr., Patty

2    Gutierrez, Christina Godoy, Veronica Gomez, Cindy Eriksen, and Jerry Donohue, the attached

3    Memorandum of Points and Authorities, the pleadings and papers on file herein, and such

4    argument as may be permitted.

5    Dated: November 2̲1̲, 2006                          Parsons Behle & Latimer

6

7

8                                                         By̲                                                
                                                             Robert L. Rosenthal

9                                                            Bar No. 6476
                                                             Shelley L. Lanzkowsky

10                                                           Bar No. 9096
                                                             Attorneys for Defendants

11                                                           Adam S. Kutner, P.C. and Adam S. Kutner

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiff and her counsel have engaged in bad faith conduct which is of such a serious nature that it warrants dismissal of Plaintiff's case (terminating sanctions).

Plaintiff, Vikki Ralev, used to work for at the Law Offices of Adam Kutner, until she voluntarily quit on August 10, 2005.  Plaintiff then filed a Charge of Discrimination with the Nevada Equal Rights Commission, and is presently suing Defendants for discrimination and other claims.

After Plaintiff stopped working for Defendants, she continued to have daily contact with her good friend, Lanette Begley, who was still working for Defendants.  In May 2006, Ms. Begley filed a Charge of Discrimination against Defendants.  At that time, Ralev and Begley were represented by Plaintiff's current attorneys, Habbas, Bognar & Associates.

Upon the instruction of Habbas, Bognar & Associates, on May 10, 2006, Begley and another employee, Christina Godoy, hid a tape recorder in Defendants' conference room and secretly tape recorded a closed door meeting between Defendant Adam Kutner and his attorney Edwin Keller, Jr.  During the meeting, Mr. Kutner and Mr. Keller discussed various issues which were clearly intended to remain privileged and confidential.  After the meeting, Begley retrieved the tape recorder and she listened to its contents with Plaintiff and her attorneys.

By illegally and unethically obtaining what was obviously intended to be privileged information, Plaintiff and her counsel have engaged in bad faith conduct which is so egregious that the Court should exercise its inherent authority and dismiss the case.  By extension, Defendants should not be required to file a responsive pleading until the Court rules on the subject Motion.

/ / /

PARSONS
BEHLE &
LATIMER

## II. FACTS

### A. ACTIONS BY PLAINTIFF AND DEFENDANTS' OTHER FORMER EMPLOYEES PRIOR TO THE SECRET TAPE RECORDING.

Plaintiff, Vikki Ralev ("Ralev"), was employed by the law firm of Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm") as an office manager/legal assistant from on or about January 23, 2004, until she voluntarily resigned on August 10, 2005. In January 2006, Ralev then filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission ("NERC"). Plaintiff is currently represented by Habbas, Bognar & Associates ("HBA"), and the Law Office of Daniel Marks. *(Kutner Declaration)*

Barbara Balatbat ("Balatbat"), who began working at the Firm on or about March 1, 2004, voluntarily resigned her employment on June 11, 2005. Thereafter, on November 3, 2005, Balatbat filed a Charge of Discrimination against the Firm with NERC. Like Ralev, Balatbat retained HBA to represent her with respect to her claims against the Firm. *(Kutner Declaration)* Ralev and Balatbat then were able to convince five other employees to file Charges of Discrimination with NERC against the Firm. *(Gutierrez, Gomez, and Godoy Declarations)*

On or about November 29, 2004, Christina Richter ("Richter") was hired as the Firm's bookkeeper/controller. On or about November 21, 2005, Richter voluntarily resigned her employment with the Firm. On February 22, 2006, Ms. Richter filed a Charge of Discrimination against the Firm with NERC, and retained HBA to represent her with respect to her claims against the Firm. *(Kutner Declaration)*

On or about October 6, 2004, Andrea Carrasco-Rivera ("Carrasco-Rivera") was hired as a front office assistant and personal assistant to Mr. Kutner. Carrasco-Rivera voluntarily resigned on or about April 15, 2005. She was then re-hired on or about June 9, 2005 as a front office supervisor, and resigned for a second time on or about July 31, 2005. On April 21, 2006, Carrasco-Rivera filed a Charge of Discrimination against the Firm with NERC, and retained HBA

- 4 -

to represent her with respect to her claims against the Firm. *(Kutner Declaration)*

On or about October 10, 2005, the Firm hired Portia Barlow ("Barlow"), and she eventually became a disbursal clerk. On June 30, 2006, Barlow voluntarily resigned her employment with the Firm. On September 14, 2006, Barlow filed a Charge of Discrimination against the Firm with NERC, and retained HBA to represent her with respect to her claims against the Firm. *(Kutner Declaration)*

On or about July 21, 2003, Lanette Begley ("Begley") was hired as a disbursal supervisor at the Firm. On September 25, 2005, Begley was promoted to disbursal manager. On April 28, 2006, Begley filed a Charge of Discrimination against the Firm with NERC. On June 12, 2006, Ms. Begley voluntarily resigned her employment with the Firm. At the time Begley filed her Charge of Discrimination with NERC, HBA represented Begley with respect to her claims against the Firm. *(Kutner Declaration)*

In 5 of the 7 cases, the Nevada Equal Rights Commission has closed the charge, finding that the evidence submitted failed to meet the legal criteria for establishing a violation of the applicable discrimination laws. The 2 remaining cases (Begley and Barlow) are still pending before NERC. *(Kutner Declaration)*

In January 2006, Begley, who was managing Defendants' Disbursal Department at the time, told her subordinate, Christina Godoy ("Godoy"), that she had retained an attorney and was looking to sue Mr. Kutner for harassment and discrimination. Begley also informed her subordinate, Veronica Gomez ("Gomez"), and Defendants' Legal Assistant/Marketing Director, Patty Gutierrez ("Gutierrez") that she had retained the same attorney as Plaintiff. *(Gutierrez and Gomez Declarations)* Begley told Gutierrez that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, along with the amount of money Mr. Kutner collected on a daily basis. *(Godoy, Gutierrez, and Gomez Declarations)*

PARSONS
BEHLE &
LATIMER

1    Around this time, Begley was in regular contact with Defendant's former employee,

2    Plaintiff, Ralev. *(Gomez Declaration)* Further, from approximately April 2006 until June 12,

3    2006 (Begley's termination date), Begley told Gutierrez on daily basis that she had spoken to

4    Ralev and Balatbat before coming to work each day in order to provide them with an update on

5    the latest events at the office, Mr. Kutner's activities, and the status of their claims against Mr.

6    Kutner. *(Gutierrez Declaration)*

7

8    In early April 2006, Begley called Godoy into her office and informed her that she had

9    met with Kutner's former employees, Ralev, and Balatbat at a local coffee shop to discuss their

10   allegations against Kutner. *(Godoy, Gomez, and Gutierrez Declarations)* Begley said that she

11   had retained the law firm of Habbas & Nasseri (the name of HBA's California office), and that

12   the same law firm was also representing Ralev and Balatbat. Around this time, Begley showed

13   Godoy her attorneys' California website, Habbas, Nasseri & Associates, which listed a 1-800

14   number. *(Godoy Declaration)*

15

16   In late April 2006, Begley informed Godoy that she had been secretly tape recording her

17   conversations regarding her medical issues with Jerry Donahue ("Donohue"), Kutner's Managing

18   Attorney, and with Office Manager Cindy Eriksen ("Eriksen"). *(Godoy Declaration)* Gomez

19   observed Begley placing the tape recorder in her shoes and pockets on several occasions. *(Gomez*

20   *Declaration)*

21

22   **B.    THE SECRET TAPE RECORDING.**

23   In May 2006, Begley (who was still working at the Firm), told Godoy that she had filed a

24   complaint with the EEOC, and that Mr. Kutner would be receiving a copy of the complaint any

25   day. *(Godoy Declaration)* On approximately May 9, 2006, Kutner received a copy of Begley's

26   Charge of Discrimination filed with the Nevada Equal Rights Commission. Upon receipt of the

27   Charge, Kutner notified his attorney, Edwin A. Keller, Jr., from the law firm of Kamer Zucker

28

PARSONS
BEHLE &
LATIMER

- 6 -

1   Abbott.  Subsequently, Kutner scheduled a meeting at his office to discuss a number of attorney-

2   client matters, including the claims filed with the Nevada Equal Rights Commission by all

3   claimants, including Ralev.  *(Kutner and Keller Declarations)*

4       Before the meeting occurred, Begley told Godoy, Gomez, and Gutierrez that she was

5   aware of the pending meeting with Mr. Kutner and his attorney.  *(Godoy, Gutierrez, and Gomez*

6   *Declarations)*  Begley told Godoy and Gomez that she intended to secretly tape record the

7   meeting.  *(Godoy and Gomez Declarations)*

8

9       Kutner's meeting with Keller was scheduled to occur on May 10, 2006 at 5:30 p.m. in

10  Kutner's main conference room.  The day of the meeting, Begley called Godoy into her office

11  and stated once again that she intended to secretly tape record their conversation.    At

12  approximately 2:15 p.m., Begley called Godoy back into her office and told her that she could not

13

14  place the tape recorder in the conference room because her office was too far away, and that it

15  would look suspicious if she was seen near the room.  Ms. Begley then asked Godoy if she was

16  willing to place the tape recorder in the conference room where it would not be seen.  Godoy told

17  Begley that she did not want to be involved, and did not want any trouble.  Begley, who was

18  Godoy's boss, threatened to tell Kutner about some mistakes she had made on a file if she did not

19  help out with the tape recording.  Godoy agreed to do as Ms. Begley asked.  *(Godoy and Gomez*

20  *Declarations)*

21

22      Begley told Godoy that she wanted to conduct a test run of the secret tape recording prior

23  to Kutner's meeting.  At Begley's instruction, Godoy placed the tape recorder in between books

24  in the conference room and secretly tape recorded a meeting between one of Kutner's employees

25  and a client.  After the client meeting was over, Godoy went back to the conference room and

26  closed the door.  She retrieved the tape recorder, listened to a portion of the tape, and deleted its

27  contents in order to free up space.  *(Godoy Declaration)*

28

PARSONS
BEHLE &
LATIMER

1

2

3

4

5

While still in the closed conference room, Godoy became nervous that the tape recorder would be discovered if it remained in between the books, so she moved the tape recorder above a television set located in an armoir, pushed "record" on the tape recorder, and proceeded to secretly tape record Mr. Kutner's meeting with Mr. Keller. *(Godoy Declaration)*

6

7

8

9

10

At approximately 5:30 that evening, Kutner had a closed door meeting with his attorney, Edwin A. Keller, Jr. in the main conference room. Also present at various times were Eriksen, Katrina Cornett, the Firm's Human Resources Manager, and attorney Donohue. The meeting was intended to be privileged and confidential, and it lasted approximately 90 minutes. *(Kutner, Keller, Donahue, and Eriksen Declarations)*

11

12

13

14

15

16

17

18

During the course of the confidential meeting, Kutner discussed various privileged and confidential matters. In order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log); but without waiving the attorney client privilege and/or the work product doctrine, they talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with NERC, including: 1) the legal and factual basis for the claims, 2) legal defenses to the claims, 3) possible legal exposure, 4) witnesses, and 5) litigation strategy. *(Kutner, Keller, Donahue, and Eriksen Declarations)*

19

20

21

At no time during the May 10, 2006 meeting was Kutner or anyone present aware that it was being secretly tape recorded. *(Kutner, Keller, Donahue and Eriksen Declarations)*

22

23

24

25

26

27

28

Later that night, at about 9:30 p.m., Godoy received a message on her telephone answering machine from Begley, asking her to call immediately. Godoy returned the phone call and spoke to Begley. Begley said that she was at Kutner's office to retrieve the secret tape recording, but the tape recorder was not in the bookshelf where it was supposed to be. Begley said she thought someone had discovered the tape recorder. Godoy then informed Begley that she had moved the tape recorder to above the television set because she thought someone would

PARSONS
BEHLE &
LATIMER

1   see it between the books.  Several moments later, Ms. Begley, sounding very relieved, said that

2   she had located the tape recorder and was going home to listen to its contents.  *(Godoy and*

3   *Gomez Declarations)*

4

5   **C.     EVENTS AFTER THE MAY 10, 2006 SECRET TAPE RECORDING.**

6       While at work the next morning, Begley informed Godoy, Gutierrez, and Gomez that she

7   had listened to the secret tape recording between Kutner and Keller.  **Ms. Begley said that she**

8   **had already talked to her attorney about the contents of the secret tape recording and that**

9   **she was in the process of setting up a meeting with her attorney so he could listen to the tape**

10  **recording.**  *(Godoy, Gutierrez, and  Gomez Declarations)*

11      That same day, Begley told Godoy that she had lied to Donahue and told him that she had

12  a doctor's appointment and would be out of the office for several hours, when in reality she

13
    would be meeting with her attorney and listening to the secret tape recording.  *(Godoy and Gomez*
14
    *Declarations)*  Upon Begley's return from her alleged doctor's appointment she also informed
15
16  Gomez that she had met with her attorney.  Begley told Gomez that her attorney had listened to

17  the entire secret tape recording and her attorney advised her not to allow anyone to listen to the

18  secret tape recording, not to talk to anyone regarding the tape, and had ordered Begley to destroy

19  the tape.  *(Gomez Declaration)*

20
    At approximately 9:30 a.m., Godoy told Gutierrez that Begley had secretly tape recorded
21
22  the entire meeting between Kutner and Keller.  **Ms. Godoy stated Begley had been instructed**

23  **by Habbas & Bognar to secretly tape record Mr. Kutner's conversations with his attorney.**

24  *(Gutierrez Declaration)*

25      At about 12:00 p.m., Begley entered Gutierrez' office and confirmed Godoy's earlier

26  comments.  Begley boasted to Gutierrez that she had secretly tape recorded the entire conference

27  room conversation the night before.  **Begley informed Gutierrez that she and her attorney had**

28

PARSONS
BEHLE &
LATIMER
                                                    - 9 -

**listened to the entire tape recording, and were excited about the evidence that they had obtained.** *(Gutierrez Declaration)*

Several hours later, Begley and Gutierrez were both seated in Gutierrez' car out in Defendants' parking lot and they talked about the tape recording. Godoy, saw the two women, walked up to the car's open window, and heard Begley say that her attorneys had listened to the secret tape recording between Kutner and his attorney. Begley then began boasting about the evidence that she had obtained from the secret tape recording, and that her attorney had advised her that they could win an enormous amount of money. Begley also informed Godoy and Gutierrez that they would be able to obtain employment at HBA. *(Godoy and Gutierrez Declarations)*

Later that evening, Begley once again played portions of the tape; this time to fellow employees Liz Cervantes, Portia Barlow, Gomez, and Godoy. As soon as attorney David Fasset exited the building to where we they were all standing, Begley stopped the tape. *(Godoy and Gomez Declarations)*

**Shortly thereafter, Begley informed Gomez that she had met Plaintiff at a local coffee shop, and played the secret tape recording to her.** *(Gomez Declaration)* Begley continued communicating with Ralev and Balatbat on a daily basis during the time Mr. Kutner's meeting was secretly tape recorded, and up and until Begley no longer worked for Mr. Kutner. *(Gutierrez Declaration)*

/ / /

/ / /

/ / /

/ / /

/ / /

PARSONS
BEHLE &
LATIMER

III.   **ARGUMENT**

A.   **IN LIGHT OF THE BAD FAITH CONDUCT ON THE PART OF PLAINTIFF AND HER COUNSEL, THE COURT SHOULD EXERCISE ITS INHERENT AUTHORITY AND ISSUE TERMINATING SANCTIONS, THEREBY DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE.**

The Court has the inherent power to impose sanctions against both attorneys and parties for "bad faith" conduct in litigation. Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991),  The Court's inherent powers are not governed by rule or statute, "…but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Id. at 43, 2132.

The Court's inherent power extends to a full range of litigation abuses; however, before sanctions may be imposed, the Court must find the attorneys and/or parties acted in bad faith, vexatiously, wantonly, or for oppressive reasons. Id. at 45-46, 213l.  Bad faith conduct may be sanctioned under the Court's inherent powers even if it is also sanctionable under other rules, such as Rule 11 or 28 U.S.C. Section 1927.  "These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. Id. at 46-48, 2134.  The Court should also exercise its power to sanction where rules or statutes are not up to the task. Id. at 51-52, 2136.

Recklessness coupled with knowledge of the rule and the applicable law is tantamount to bad faith and is therefore sanctionable under the Court's inherent power. B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1106, 1108 (9th Cir. 2002).  Further, simply because a claim may be colorable, does not mean that the Court cannot find bad faith.   Mark Industries, Ltd. v. Sea Captain's Choice, Inc., 50 F.3d 730, 732 (9th Cir. 1995).

Where there is bad faith conduct during any aspect of the litigation, the Court has the power to impose sanctions. Lamb Engineering & Const. Co. v. Nebraska Public Power Dist., 103 F.3d 1422, 1435-1436 (8th Cir. 1987).

PARSONS
BEHLE &
LATIMER

- 11 -

An attorney admitted to the State Bar may be disciplined under the Court's inherent power for conduct that violates the State Bar's rules of professional conduct, including conduct that occurs outside the Court. United States v. Wunsch, 84 F.3d 1110, 1114 (9th Cir. 1996).

The Court may dismiss an action due to bad faith conduct. In Combs v. Rockwell, International Corp., 927 F.2d 486 (9th Cir. 1991), a client authorized his attorney to alter deposition responses upon review of the transcript. The client's sworn statement that he had reviewed the transcript was shown to be false. The Court held that dismissal was an appropriate sanction under Rule 11 and the Court's inherent power to redress the bad faith conduct. Id. at 488.

In Hull v. Municipality of San Juan, 356 F.3d 98 (1st Cir. 2004), the Court exercised its inherent power and dismissed plaintiff's case because plaintiff deliberately withheld information about prior accidents and injuries from the defense attorney during discovery. Id. at 102-103. Similarly, in Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337 (9th Cir. 1995), the Court dismissed defendant's counterclaim pursuant to its inherent power because defendant knew that documents she claimed had been destroyed in a fire had survived and she concealed and lied about their existence, as well as repeatedly violating the Court's publicity order and in limine rulings. In reaching its decision, the Court stated, "…dismissal is warranted where, as here, a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." Id. at 348.

Another case where the Court saw fit to dismiss an action occurred in Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d 585. In Wyle, the Court dismissed plaintiff's complaint and counterclaim because it knowingly filed false denials, and due to the fact that plaintiff's law firm deliberately frustrated the production of documents. Id. at 589. The Court also held that courts have the inherent power to dismiss an action where a party has willfully deceived the Court and

1

"engaged in conduct utterly inconsistent with the orderly administration of justice." Id. at 589.

2

3

4

5

6

7

8

The present case falls squarely into the confines of Anheuser-Busch, Wyle, and Combs, such that dismissal of Plaintiff's action is entirely appropriate. Here, Plaintiff and her counsel are guilty of bad faith conduct. HBA's instructing Begley to secretly tape record what they knew was a privileged meeting between Kutner and his attorney was illegal (pursuant to NRS 200.650) and unethical. Plaintiff's counsel compounded their ethical violations by then meeting with Begley and listening to the tape recording.

9

10

11

12

13

14

During the litigation of this case from NERC proceedings to present, there has also been an utter lack of candor by Plaintiff's counsel. HBA had an absolute duty to disclose the secret tape recording; but neither Plaintiff's counsel nor their clients have ever advised Defendants about the tape recording and are clearly trying to use information gleaned during the confidential meeting for an improper tactical advantage.

15

16

17

18

19

20

The Declarations of Gutierrez, Gomez, and Godoy establish that Plaintiff knew about the secret tape recording and listened to its contents. Begley and Plaintiff spoke every morning and discussed events at Defendants' office. Further, Begley told Gomez that she had met with Plaintiff at a coffee shop after the secret tape recording and listened to the tape together. Simply stated, Plaintiff was just as much a party to the bad faith conduct as HBA and Begley.

21

22

23

24

25

26

27

28

The Declarations of Kutner, Eriksen, and Keller establish the May 10, 2006 meeting was intended to be privileged and that the participants discussed many confidential issues, including financial exposure, litigation strategy, defenses, and witnesses. The Declarations of Godoy, Gutierrez, and Gomez indicate that Plaintiff's counsel, 1) knew that Kutner would be meeting with his attorney to discuss litigation matters involving all claimants – including Plaintiff, 2) instructed Begley to hide a tape recorder in the conference room where Kutner would be having the closed door meeting and record the contents of the discussion, and 3) listened to the tape

PARSONS
BEHLE &
LATIMER

1  recording with Begley.

2      Plaintiff wrongfully and illegally acquired an unfair advantage that undermines the

3  integrity of the judicial process and will have a continuing effect on the proceedings before the

4
5  court.  Plaintiff is now aware of Defendants' overall litigation strategy, Defendants' potential

6  exposure, etc.  Plaintiff cannot "unlearn" this privileged information; it will forever permeate and

7  taint the case as long as it is litigated.  Further, it would be impossible to erect a "Chinese Wall"

8  between the illegally obtained information and Plaintiff and her future counsel.   Whatever

9  knowledge Plaintiff has gleaned from communications with HBA and/or listening to the secret

10  tape recording, cannot be undone.  The only way to cure the bad faith is to dismiss the lawsuit.

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

PARSONS
BEHLE &
LATIMER

1

**III.    CONCLUSION**

2

Plaintiff and her counsel, Habbas, Bognar and Associates, have intentionally obtained

3

privileged information through the most vile means: Secretly tape recording  a meeting between

4

Defendant, Adam Kutner, and his attorney, Edwin Keller, Jr. in which they discussed all aspects

5

of the subject litigation.  To make matters worse, Plaintiff and her counsel then listened to the

6

secret tape recording.  By taking such obviously unethical actions, Plaintiff and her attorneys

7

have acted in bad faith, have gained an unfair advantage, and are in a position to exploit

8

Defendants.

9

Accordingly, the Court should exercise its inherent power and terminate Plaintiff's case.

10

Further, Defendants respectfully request that the Court stay the deadline to file a responsive

11

pleading until such time as the Court rules on Defendants' Motion.

12

13

Dated: November 2/ 2006                                Parsons Behle & Latimer

14

15

16                                                     By: _____
                                                          Róbert L. Rosenthal
17                                                          Bar No. 6476
                                                          Shelley L. Lanzkowsky
18                                                          Bar No. 9096
                                                          Attorneys for Defendants
19                                                          Adam S. Kutner, P.C. and Adam S. Kutner

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

- 15 -

1

## PROOF OF SERVICE

2

I, Barbara Dunn, declare:

3

I am a citizen of the United States and employed in Clark County, Nevada. I am over the

4

age of eighteen years and not a party to the within-entitled action. My business address is 411 E.

5

Bonneville Avenue, Suite 300, Las Vegas, Nevada 89101. On November 21, 2006, I served a

6

copy of the within document(s):

7

MOTION FOR TERMINATING SANCTIONS DUE TO BAD FAITH CONDUCT

8
9

☐     by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

10
11

☒     by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

12
13

☐     by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

14
15

☐     by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

16
17
18

Daniel Marks, Esq.                                    Michael J. Bognar, Esq.
LAW OFFICE OF DANIEL MARKS        HABBAS, BOGNAR & ASSOC.
302 E. Carson, Suite 702                          528 S. Casino Center Blvd., 3rd Floor
Las Vegas, NV 89101                              Las Vegas, NV 89101

19

I am readily familiar with the firm's practice of collection and processing correspondence

20

for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same

21

day with postage thereon fully prepaid in the ordinary course of business.

22

I declare under penalty of perjury under the laws of the State of Nevada that the above is

23

true and correct.

24

Executed on November 21, 2006, at Las Vegas, Nevada.

25
26
27

Barbara J. Dunn
Barbara J. Dunn

28

99999.999/915723.1

Defendants' Certificate As To Interested Parties Required By Local Rule

# DECLARATION OF ADAM KUTNER

## DECLARATION OF ADAM KUTNER

I, Adam S. Kutner, declare:

1.     I am the sole shareholder and principal of Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm").

2.     I am an attorney licensed to practice in all the courts of the State of Nevada.

3.     Plaintiff, Vikki Ralev, was employed by the Firm as an office manager/legal assistant from on or about January 23, 2004, until she voluntarily resigned on August 10, 2005.

4.     Plaintiff is currently represented by Habbas, Bognar & Associates, and the Law Office of Daniel Marks to represent her with respect to her claims against the Firm and me personally.

5.     On or about March 1, 2004, I hired Barbara Balatbat as a secretary/receptionist. Ms. Balatbat eventually became the Firm's disbursal manager. On November 3, 2005, Ms. Balatbat filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission. On or about June 11, 2005, Ms. Balatbat voluntarily resigned her employment with the Firm.

6.     I am aware that Ms. Balatbat retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

7.     On or about November 29, 2004, I hired Christina Richter as the office bookkeeper/controller. Subsequently, on or about November 21, 2005, Ms. Richter voluntarily resigned her employment with my Firm. On February 22, 2006, Ms. Richter filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

8.     I am aware that Ms. Richter retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

9.      On or about October 6, 2004, I hired Andrea Carrasco-Rivera as a front office assistant. She resigned on or about April 15, 2005. She was rehired on or about June 9, 2005 as a front office supervisor and resigned for a second time on or about July 31, 2005. On April 21, 2006, Ms. Carrasco-Rivera filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

10.     I am aware that Ms. Carrasco-Rivera retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

11.     On or about October 10, 2005, the Firm hired Portia Barlow and she eventually became a disbursal clerk. On June 30, 2006, Ms. Barlow voluntarily resigned her employment with the Firm. On September 14, 2006, Ms. Barlow filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission.

12.     I am aware that Ms. Barlow retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

13.     On or about July 21, 2003, I hired Lanette Begley as a disbursal supervisor. She became the disbursal manager on or about September 25, 2005. On April 28, 2006, Ms. Begley filed a Charge of Discrimination against the Firm with the Nevada Equal Rights Commission. On June 12, 2006, Ms. Begley voluntarily resigned her employment with my Firm.

14.     I am aware that Ms. Begley retained Habbas, Bognar & Associates to represent her with respect to her claims against the Firm.

15.     In each case where there has been a determination issued, the Nevada Equal Rights Commission has closed the charge, finding that the evidence submitted failed to meet the legal criteria for establishing a violation of the applicable discrimination laws.   The Charges of

Discrimination filed by Ms. Begley and Ms. Barlow are still pending before the Nevada Equal Rights Commission.

16.     On approximately May 9, 2006, I received a copy of Ms. Begley's Charge of Discrimination filed with the Nevada Equal Rights Commission. Upon receipt of the Charge, I notified my attorney, Edwin A. Keller, Jr. with the law Firm of Kamer Zucker Abbott and scheduled a meeting at my office to discuss a number of attorney-client matters, including Ms. Begley's claims and those of the other claimants.

17.     On May 10, 2006, at 5:30 p.m., I had a closed door meeting with my attorney, Edwin A. Keller, Jr. in the main conference room. Also present at various times were Cindy Eriksen, the Firm's Office Manager/Controller, and Jerry Donohue, the Firm's Managing Partner. The meeting was intended to be privileged and confidential. It lasted approximately ninety minutes.

18.     During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters. Without waiving the attorney client privilege and/or the work product doctrine; but in order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log), we talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for the claims, 2) legal defenses to the claims, 3) possible legal exposure, 4) witnesses, and 5) litigation strategy.

19.     At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and if I had known, I never would have consented to such action.

/ / /

/ / /

20.    Plaintiff's counsel has never contacted me or my counsel to advise me about the secret tape recording.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 20, 2006              By:    _____

                                             Adam S. Kutner

# DECLARATION OF PATTY GUTIERREZ

## DECLARATION OF PATTY GUTIERREZ

I, Patty Gutierrez, declare:

1.  Since April 1998 I have been employed by the Law Offices of Adam Kutner & Associates as a Legal Assistant/Marketing Director.

2.  From 2001 until June 2006 I worked with Lanette Begley, who managed Mr. Kutner's disbursal department.

3.  In or around January 2006, Ms. Begley told me that she and former employee, Vikki Ralev, had retained the law firm of Habbas Bognar & Associates to represent them with respect to claims they had against Mr. Kutner.

4.  From January 2006 until June 2006, Ms. Begley repeatedly told me that she and Ms. Ralev expected to receive millions of dollars in compensation as a result from suing Mr. Kutner, and she often asked if I would join them in their lawsuit. I declined the invitations.

5.  In or around March 2006, Ms. Begley told me that she had been experiencing panic attacks and had a heart condition. Prior to March 2006, Ms. Begley never complained to me about any health problems. Around that time, Ms. Begley also informed me Habbas Bognar & Associates had hired a private investigator to look into the backgrounds of Mr. Kutner and attorney David Fassett, with the law firm of Fassett & Cardoza.

6.  In the latter part of April 2006, Ms. Begley informed me that her attorney had filed a complaint against Mr. Kutner with the EEOC based on sexual harassment and discrimination. Ms. Begley said that she was nervous about whether or not Mr. Kutner would terminate her employment once he received a copy of the complaint.

7.  Two to three days later, Mr. Kutner received a copy of Ms. Begley's EEOC complaint. Ms. Begley told me that Mr. Kutner arranged to have his attorney, Edwin Keller, with

the law firm Kamer, Zucker & Abbott, meet at Mr. Kutner's office two days later in order to discuss the claims filed with the EEOC. Ms. Begley said that the meeting between Mr. Kutner and Mr. Keller was scheduled for 5:00 p.m. in Mr. Kutner's conference room.

8.     On May 10, 2006, at approximately 4:30 p.m. on the day Mr. Kutner was scheduled to meet Mr. Keller, I observed Ms. Begley pacing back and forth in front of the conference room area. Ms. Begley appeared very nervous, and kept entering and exiting my office, which was adjacent to the conference room. At approximately 5:00 p.m., I observed Mr. Kutner and Mr. Keller enter the conference room and shut the door behind them. Several minutes later I left work for the day. I do not know how long the meeting between Mr. Kutner and Mr. Keller lasted.

9.     The following morning, at approximately 9:30 a.m., a fellow employee, Christina Godoy, came into my office and proceeded to inform me that the night before, Ms. Begley had secretly tape recorded the entire meeting between Mr. Kutner and Mr. Keller. Ms. Godoy said that she had listened to the tape recording and could not believe the amount of evidence obtained. Ms. Godoy further told me that Mr. Kutner was going to be "destroyed." Ms. Godoy also stated Ms. Begley had been instructed by Habbas & Bognar to record Mr. Kutner's conversations with his attorney.

10.     Later that day, at approximately 12:00 p.m., Ms. Begley entered my office and boasted that she had secretly tape recorded the entire conference room conversation between Mr. Kutner which took place the night before. Shortly thereafter, Ms. Begley informed me that she and her attorney had listened to the entire tape recording, and were excited about the evidence that they had obtained.

11.    During the month following Ms. Begley's telling me about the secret tape recording, Ms. Begley came into my office on several occasions and said that her attorney intended on going to the media and exposing Mr. Kutner as being racist toward Hispanics.

12.    From approximately April 2006 until June 12, 2006 (the date Lanette Begley quit her job), Ms. Begley came into my office on a daily basis to tell me that she had spoken with Vikki Ralev and Barbara Balatbat before coming to work in order to provide them with an update on the latest events at the office, Mr. Kutner's activities, and the status of their claims against Mr. Kutner. Ms. Begley's daily reports to me concerning her communications with Ms. Ralev and Ms. Balatbat also took place during the time Mr. Kutner's meeting with Mr. Keller was secretly tape recorded.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _NOV 21, 2006_, 2006        By: _____
                                            Patty Gutierrez

# DECLARATION OF VERONICA GOMEZ

## DECLARATION OF VERONICA GOMEZ

I, Veronica Gomez, declare:

1.   In August 2005, I began working for the law firm Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm") as a Disbursal Representative, and I continue to be employed in that capacity.

2.   From August 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3.   In early 2006, I overheard several telephone conversations between Ms. Begley and Mr. Kutner's former employee, Vikki Ralev. At that time, my desk was located adjacent to Ms. Begley's office, and she most always left her door open, and spoke loudly. Additionally, Ms. Begley personally discussed with me her lawsuit against Mr. Kutner.

4.   Ms. Begley told me that me that Ms. Ralev filed a Complaint with the EEOC against Mr. Kutner and that she was going to receive a large amount of money.  I heard Ms. Begley frequently speak on the phone to Ms. Ralev about Mr. Kutner, including providing her with information regarding Mr. Kutner's office. Ms. Begley was constantly trying to get other employees to join her campaign against Mr. Kutner. Ms. Begley eventually asked me to pursue claims against Mr. Kutner, but I responded that I did not have any reason to sue Mr. Kutner.

5.   Prior to Ms. Begley filing her Complaint with the EEOC, she informed me that she had retained the same attorneys as Ms. Ralev and other former employees. Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, and the dates and times of each conversation. Ms. Begley told me that she was going to buy a house with the large settlement she received from the "mother fucker." Also, at this time Ms. Begley instructed me not to work productively on Mr. Kutner's files so his collections would decrease.  I also observed Ms. Begley shredding Mr. Kutner's documents

while laughing aloud. I observed Ms. Begley shredding documents, and various checks which belonged to Mr. Kutner.

6. In May 2006, I observed Ms. Begley giving her miniature tape recorder to employee Portia Barlow so she could tape record all of her meetings with Mr. Kutner's management. I observed both Ms. Begley and Ms. Barlow placing the tape recorder in their shoes and pockets at various times.

7. At around the same time, Ms. Begley admitted to me that she wanted to intentionally set her car on fire to get rid of her old car and collect insurance money. Additionally, Ms. Begley informed me that she sued her previous employer for sexual harassment. I was becoming concerned with Ms. Begley's behavior, and tried to avoid getting involved; however, it was hard to avoid overhearing Ms. Begley's plans against Mr. Kutner because of the location of my desk, and she kept insisting on telling me everything.

8. On May 10, 2006, I heard Ms. Begley tell Christina Godoy that Mr. Kutner, and his management were having a meeting later that evening and that she was not included. I heard Ms. Begley order Ms. Godoy to place the tape recorder in Mr. Kutner's conference room. I also heard Ms. Begley threaten Ms. Godoy that if she did not place the tape recorder in the conference room she would tell Mr. Kutner about a file that Ms. Godoy had made a mistake on, and Ms. Godoy would lose her job. Ms. Godoy then agreed to Ms. Begley's request. Ms. Begley told me that she wanted to secretly tape record the meeting so she could hear what Mr. Kutner intended to do regarding her complaint. Ms. Begley also told me that she was waiting for Mr. Kutner to terminate her because it would be better for her lawsuit against him.

9. Later that evening, Ms. Begley called my cell phone several times in a state of panic asking me where Ms. Godoy was. I told Ms. Begley I was not aware of Ms. Godoy's

whereabouts. I then asked Ms. Begley what was wrong, and she told me that she had told Ms. Godoy to place the tape recorder behind the books in Mr. Kutner's conference room, but she could not locate it. Further, Ms. Begley told me that was very nervous that someone had found the tape recorder.

10. The next day, Ms. Begley told Ms. Godoy and I to come into her office. Ms. Begley informed us that she had listened to the secret tape, and that she had heard Mr. Kutner's meeting with his attorney, Mr. Keller. Ms. Godoy and I then went into Ms. Begley's office and she asked us to close the door. Ms. Begley was excited about the contents on the tape, and told us that she had heard Mr. Keller advising Mr. Kutner on the pending lawsuits filed against Mr. Kutner by the group of claimants represented by the same attorney which Ms. Begley had retained. Additionally, Ms. Begley informed me that she heard Mr. Kutner and his attorney discussing possible settlement regarding one of the claimants. Further, Ms. Begley informed us that she intended to bring the secret tape recording to her attorney to let him listen to its contents.

11. Ms. Begley told me that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording. Upon Ms. Begley's return from her alleged doctor's appointment she informed me that she had actually met with her attorney. Ms. Begley told me that her attorney had listened to the entire secret tape recording and her attorney advised her not to allow anyone to listen to the secret tape recording, not to talk to anyone regarding the tape, and ordered Ms. Begley to destroy the tape.

12. At the close of work that day, Ms. Begley told Ms. Godoy and I to come outside with her and listen to the secret tape recording which she had obtained. Ms. Begley pressed play, and I heard Mr. Kutner conversing with his attorney regarding Ms. Begley. Further, I heard

settlement discussions concerning another claimant who had also retained the same attorneys as Ms. Begley.  Shortly thereafter, we saw attorney David Fasset exiting the building where we were all standing, and Ms. Begley stopped the tape.  Ms. Begley  had tried on several occasions to play the secret tape recording for Ms. Godoy and I; however, we were always interrupted. Ms. Begley also told me that she had also played the secret tape recording to at least 6 other of Mr. Kutner's employees.  Further, I heard Ms. Begley tell one of Mr. Kutner's employees that she had let one of the complainants who had retained the same attorney as Ms. Begley also listen to the secret tape recording.

13.     Shortly thereafter, Ms. Begley informed me that she had met Vikki Ralev at a local coffee shop, and played the secret tape recording to her.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _November 21_, 2006          By:_____
                                            Veronica Gomez

# DECLARATION OF CHRISTINA GODOY

## DECLARATION OF CHRISTINA GODOY

I, Christina Godoy, declare:

1. On May 5, 2005, I began working for the law firm Kutner & Associates as a Disbursal Representative. On June 16, 2006, I was promoted to Disbursal Manager, and I continue to be employed in that capacity.

2. From May 5, 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3. In January 2006, Ms. Begley told me that she had retained an attorney and was looking to sue Mr. Kutner for harassment and discrimination. Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, along with the amount of money Mr. Kutner collected on a daily basis.

4. In early April 2006, Ms. Begley called me into her office and informed me that she met with Mr. Kutner's former employees, Vikki Ralev, and Barbara Balatbat at a local coffee shop to discuss their allegations against Mr. Kutner. Ms. Begley said that she had retained the law firm of Habbas & Nasseri, and that the same law firm was also representing Ms. Ralev and Ms. Balatbat. Ms. Begley then told me that she intended to file harassment and discrimination claims against Mr. Kutner with the EEOC. Ms. Begley claimed that her attorneys were "big," and that her case against Mr. Kutner would be "big money." Additionally, Ms. Begley claimed that she was aware of several people who were filing similar claims against Mr. Kutner, and that they intended to file a class action lawsuit. During the same conversation, Ms. Begley maintained that she knew all about Mr. Kutner's insurance coverage regarding employee complaints. Ms. Begley, who knew that I had previous insurance coverage experience, then asked me whether or not Mr. Kutner's insurance coverage was capped, and what amount of

funds could someone receive if a lawsuit was filed against Mr. Kutner for harassment and discrimination. At that time, Ms. Begley requested that Veronica Gomez, Portia Barlow, Kenia Onofre, and myself provide affidavits regarding how Mr. Kutner treated Ms. Begley. I told Ms. Begley that I would not provide her with an affidavit because her contentions were not true. I advised Ms. Begley to think about what she was doing, and that she should think of her family.

5.     After Ms. Begley informed me that she was going to file a lawsuit against Mr. Kutner, she began complaining to me on a daily basis about Mr. Kutner's behavior. I told Ms. Begley that if she did not like it, she should work somewhere else. Ms. Begley responded that she was going to stay until Mr. Kutner was forced to fire her.

6.     In mid April 2006, Ms. Begley asked Veronica Gomez, Kenia Onofre, and Portia Barlow and myself if we intended to join her in filing a complaint against Mr. Kutner. I told Ms. Begley that I had no intention of filing a complaint against Mr. Kutner. I do not know how Ms. Gomez, Ms. Onofre, or Ms. Barlow responded to Ms. Begley's question.

7.     Shortly thereafter, Ms. Begley told me that she was intentionally refusing to turn in her disbursal sheets to Mr. Kutner (as was customary), in an attempt to upset Mr. Kutner and force him to terminate her employment. Around this time, Ms. Begley showed me her attorneys' California website, Habbas, Nasseri & Associates, which listed a 1-800 number.

8.     In late April 2006, Ms. Begley informed me that she had been secretly tape recording her conversations regarding her medical issues with Jerry Donahue, Mr. Kutner's Managing Attorney, and with Office Manager, Cindy Erickson.

9.     In May 2006, Ms. Begley informed me that she had filed a complaint with the EEOC, and that Mr. Kutner would be receiving a copy of the complaint any day.

10.    Several days later, Ms. Begley said that Mr. Kutner had received a copy of her EEOC complaint. Ms. Begley angrily told me that Mr. Kutner told her that he would no longer conduct meetings with her without other individuals being present.

11.    Shortly after Ms. Begley informed me that Mr. Kutner had received a copy of her EEOC complaint, she told me that Mr. Kutner had scheduled a meeting with his attorney, Ed Keller, to discuss the EEOC charges filed against him. Ms. Begley said that she intended to secretly tape record Mr. Kutner's meeting with his attorney.

12.    Around this time, Ms. Begley also informed me that she had played the secret tape recording of her conversations with Jerry Donahue and Ms. Erickson to her attorney. Ms. Begley played a portion of a tape recording between Mr. Donohue and Ms. Begley, and I heard Mr. Donahue discussing Ms. Begley's performance issues in a very professional manner. I also heard Mr. Donahue advising Ms. Begley of her rights to seek FMLA protection if her health issues were a concern.

13.    On May 10, 2006, Mr. Kutner was scheduled to meet with his attorney, Mr. Keller, Ms. Begley called me into her office. Ms. Begley said that Mr. Kutner was going to meet Mr. Keller at 5:30 p.m. in Mr. Kutner's conference room. Ms. Begley stated once again that she intended to secretly tape record their conversation. At approximately 2:15 p.m., Ms. Begley called me into her office and told me that she could not place the tape recorder in the conference room because her office was too far away, and that it would look suspicious if she was seen near the room. Ms. Begley then asked me if I would be willing to place the tape recorder in the conference room on the bookshelf where it would not be seen. I told Ms. Begley that I did not want to be involved, and did not want any trouble. Ms. Begley proceeded to threaten to go to Mr. Kutner and tell him about some mistakes I had made on a file. Ms. Begley then repeated her

request and asked me to place the tape recorder in the conference room as a personal favor to her. I agreed to do as Ms. Begley asked.

14. Ms. Begley proceeded to show me the tape recorder, which was digital, and which was apparently capable of recording up to 4 hours of conversation. Ms. Begley showed me how to turn the tape recorder on and also instructed me how to delete portions of prior recordings so that I would have enough "tape" to record Mr. Kutner's and Mr. Keller's entire conversation.

15. Ms. Begley said that she wanted to conduct a test run of the secret tape recording prior to Mr. Kutner's and Mr. Keller's meeting. Ms. Begley stated that employee Liz Cervantes, was scheduled to meet with one of Mr. Kutner's clients in the conference room in fifteen minutes, and she instructed me to secretly tape record their meeting.

16. I then went to Mr. Kutner's conference room and placed the tape recorder between books on a bookshelf. I pushed the record button, and went back to my office awaiting the conclusion of Ms. Cervantes' meeting.

17. Approximately 35 minutes later, Ms. Begley called me on my office phone from her office and informed me that Gabriella Perez conducted the client meeting instead of Ms. Cervantes. Ms. Begley said that she saw Ms. Perez leave the conference room, and instructed me to retrieve and listen to the recording to ensure that the recorder clearly picked up the conversation.

18. I then went back to the conference room and closed the door. I retrieved the tape recorder and pushed the play button and heard Ms. Perez's voice. I then deleted the contents of the recording in order to free up space and record Mr. Kutner's and his attorney's meeting.

19. While still in the closed conference room, I became nervous that the tape recorder would be discovered if it remained in between the books, so I moved the tape recorder above a

television set located in an armoir, pushed "record" on the tape recorder, and proceeded to secretly tape record Mr. Kutner's meeting with his attorney, Mr. Keller. I then went back to my office, and I left work for the day at approximately 5:15 p.m. that evening.

20.     Later that night at about 8:30 p.m., I received a message on my telephone answering machine from Ms. Begley, asking me to call her immediately. Ms. Begley sounded panicked and upset. I immediately returned Ms. Begley's call. Ms. Begley said that she was at Mr. Kutner's office to retrieve the secret tape recording, but the tape recorder was not in the bookshelf where it was supposed to be. Ms. Begley said that she believed someone had discovered the tape recorder. I then informed Ms. Begley that I had moved the tape recorder to above the television set because I thought someone would see it between the books. Several moments later, Ms. Begley, sounding very relieved, said that she had located the tape recorder and was going home to listen to its contents.

21.     While at work the next morning, Ms. Begley informed me that she had listened to the secret tape recording between Mr. Kutner and his attorney, Mr. Keller. Ms. Begley said that she had already talked to her attorney about the contents of the secret tape recording and that she was in the process of setting up a meeting with her attorney so he could listen to the tape recording. Ms. Begley stated that her attorney had advised her not to let anyone else listen to the tape. Ms. Begley also told me that she had informed her attorney that I placed the tape recorder in the conference room.

22.     That same day, Ms. Begley said that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording.

23.      Several hours later Ms. Begley returned to work. I then observed Ms. Begley in the parking lot sitting in Patty Gutierrez's car talking. I walked up to Ms. Gutierrez's car where the window was rolled down and listened to their conversation. I heard Ms. Begley tell Ms. Gutierrez that her attorneys had listened to the secret tape recording between Mr. Kutner and his attorney. At that time, Ms. Gutierrez asked me if I was the one who put the tape recorder in the conference room, and I said yes. Ms. Begley told me that the tape recording contained the entire conversation between Defendant and his attorney addressing her claims. Ms. Begley then began boasting to me about the evidence that she had obtained from the secret tape recording of Defendant and his attorney, and that her attorney had advised her that they could win an enormous amount of money hands down. Ms. Begley also informed myself and Ms. Gutierrez that we would be able to obtain employment with her attorney at the law firm of Habbas & Bognar.

24.      Later that evening, Ms. Begley told Liz Cervantes, Portia Barlow, Veronica Gomez, and I about the secret tape recording that she and her attorneys had obtained. Ms. Begley boasted that her possible damages would not be capped and she could receive millions of dollars. Additionally, Ms. Begley told Ms. Gomez and I to come outside with her and listen to the secret tape recording which she had obtained. We proceeded outside of Mr. Kutner's office and listened to the tape. I heard Cindy Erickson discussing Ms. Begley's issues with Mr. Kutner's attorney, including settlement possibilities. I also heard Mr. Kutner conversing with his attorney regarding Ms. Begley. As soon as attorney David Fasset exited the building to where we were all standing, Ms. Begley stopped the tape.

25.      Shortly thereafter, Ms. Begley informed me that her attorneys had prepared a letter of resignation, and that her attorneys told her that she could present it to Mr. Kutner when

she was ready.   Ms. Begley told me that she intended to quit while I was on vacation in an attempt to cause Mr. Kutner problems with his collections.   I informed Mr. Kutner of Ms. Begley's intentions, and prior to my leaving on vacation, I prepared all of the pending accounts to avoid any problems in the event of Ms. Begley's departure.   Upon return from my vacation, I learned that Ms. Begley had submitted her resignation while I was away.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11|20| _____, 2006          By: _____
                                          Christina Godoy

# DECLARATION OF CINDY ERIKSEN

## DECLARATION OF CINDY ERIKSEN

I, Cindy Eriksen, declare:

1.     At all relevant times I have been employed as the Office Manager at Kutner & Associates.

2.     This Declaration shall not be construed as a waiver of the attorney client privilege and/or the work product doctrine.

3.     On approximately May 8, 2006, Mr. Kutner advised me to attend a closed door meeting on May 10, 2006, at 5:30 p.m. with Mr. Kutner, his attorney, Ed Keller, and Managing Partner, Jerry Donohue.

4.     On May 10, 2006, at 5:30 p.m., I attended the closed door meeting in Mr. Kutner's office conference room.  The meeting between the four of us was intended to be privileged and confidential.  The meeting lasted approximately 90 minutes.

5..     During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters.  In order to provide the Court with a general sense of the privileged nature of the meeting, we talked about many issues concerning all of the claimants who filed claims with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for all claims, 2) possible exposure, 3) settlement, and 4) litigation strategy.

/ / /

/ / /

/ / /

/ / /

/ / /

6.     At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and had I known, I never would have consented to such action.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:___Nov. 21___, 2006          By:___Cindy Eriksen___
                                        Cindy Eriksen

# DECLARATION OF EDWIN KELLER, JR.

## DECLARATION OF EDWIN KELLER, JR.

I, Edwin A. Keller, Jr., declare:

1.    I am an attorney and shareholder at the law firm of Kamer Zucker Abbott. I am licensed to practice in all the courts of the State of Nevada. At all relevant times, I represented Adam S. Kutner, P.C. with respect to employment law matters.

2.    This Declaration is not intended to create and shall not be construed as a waiver of the attorney-client privilege and/or the work product doctrine.

3.    On May 10, 2006, at 5:30 p.m., I attended a closed door meeting at Mr. Kutner's office in the main conference room with Adam Kutner; Cindy Erickson, Office Manager/Controller; Katrina Cornett, Human Resources Manager; and Jerry Donohue, Managing Partner in attendance at various times. The meeting was intended to be privileged and confidential. The meeting lasted approximately ninety (90) minutes.

4.    During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters. In order to provide the Court with a general sense of the privileged nature of the meeting (similar to a privilege log), we talked about personnel issues and issues concerning the claimants who filed Charges of Discrimination with the Nevada Equal Rights Commission, including: (1) the legal and factual basis for the claims; (2) legal defenses to the claims; (3) possible legal exposure; and (4) litigation strategy.

5.    At no time during the May 10, 2006 meeting was I aware that it was being tape recorded. Additionally, at no time did I consent to the recording of any conversation or meeting that I had related to the representation of Adam S. Kutner, P.C.

Page 1 of 2

The foregoing is based upon my personal knowledge and recollection.  If called to testify, I could and would competently testify thereto.  Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2006                    By: _____
                                                Edwin A. Keller, Jr.

# DECLARATION OF JERRY DONOHUE

## DECLARATION OF JERRY DONOHUE

I, Jerry Donohue, declare:

1.      At all relevant times I was employed as the Managing Attorney at Kutner & Associates.

2.      This Declaration shall not be construed as a waiver of the attorney client privilege and/or the work product doctrine.

3.      On approximately May 8, 2006, Mr. Kutner advised me to attend a closed door meeting on May 10, 2006, at 5:30 p.m. with Mr. Kutner, his attorney, Ed Keller, and Office Manager, Cindy Eriksen.

4.      On May 10, 2006, at 5:30 p.m., I attended the closed door meeting in Mr. Kutner's office conference room. The meeting between the four of us was intended to be privileged and confidential. The meeting lasted approximately 90 minutes.

5..     During the course of the May 10, 2006 meeting, we discussed various privileged and confidential matters. In order to provide the Court with a general sense of the privileged nature of the meeting; but without waiving the attorney client privilege and/or the work product doctrine, we talked about many issues concerning all of the claimants who filed claims with the Nevada Equal Rights Commission, including: 1) the legal and factual basis for all claims, 2) possible exposure, 3) settlement, and 4) litigation strategy.

6.      At no time during the May 10, 2006 meeting was I aware that it was being secretly tape recorded, and had I known, I never would have consented to such action.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Dated: Nov. 2 0 _____, 2006

By: _____

Jerry Donohue