LAW OFFICE OF DANIEL MARKS
DANIEL MARKS, ESQ.
Nevada State Bar No. 002003
302 East Carson, Suite 702
Las Vegas, Nevada 89101
(702) 386-0536 - FAX: (702) 386-6812
Co-Counsel for Plaintiff
          -and-
HABBAS, BOGNAR & ASSOCIATES, P.C.
Michael J. Bognar, Esq.
Nevada State Bar No. 008966
528 South Casino Center Blvd., 3rd Floor
Las Vegas, Nevada 89101
Co-Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

VIKKI RALEV,

       Plaintiff,                Case No.     2:06-CV-1494(KJD)

       vs.

ADAM S. KUTNER, P.C. and
ADAM S. KUTNER, individually,

       Defendants.

_____/

## OPPOSITION TO MOTION FOR TERMINATING SANCTIONS DUE TO BAD FAITH CONDUCT
### -and-
## OPPOSITION TO MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL

Plaintiff Vikki Ralev, by and through her counsel of record, Daniel Marks, Esq., respectfully submits this Memorandum of Points and Authorities in Support of the Plaintiffs' Opposition to Motion for Terminating Sanctions Due to Bad Faith Conduct and Motion to Disqualify Plaintiff's Counsel.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

1

1    This motion is supported by the Affidavits of, Vikki Ralev, Daniel Marks, Esq., Omar Habbas,

2    Esq., Michael Bognar, Esq., and Lanette Begley. As well as the attached Memorandum of Points and

3    Authorities.

4          DATED this _14_ day of December 2006.

5                                         LAW OFFICES OF DANIEL MARKS

6
                                          _____
7                                         DANIEL MARKS, ESQ.
                                          Nevada State Bar No. 002003
8                                         302 East Carson Avenue, Suite 702
                                          Las Vegas, Nevada 89101
9                                                      -and-
                                          HABBAS, BOGNAR & ASSOCIATES, P.C.
10                                        MICHAEL J. BOGNAR, ESQ.
                                          Nevada State Bar No. 008966
11                                        528 South Casino Center Blvd., 3rd Floor
                                          Las Vegas, Nevada 89101
12                                         Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2

1          <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2   **I.      INTRODUCTION**

3          Vikki Ralev began working at the Law Offices of Adam S. Kutner on January 23, 2004. During

4   the Plaintiffs' employment with Adam S. Kutner she was subjected to extreme and vulgar physical and

5   emotional abuse by the Defendant. As time progressed, the Defendant's action continued to escalate and

6   the Plaintiff was left with no option but to: 1)continue to work under these conditions, or 2) resign. With

7   no change in sight, the Plaintiff was forced to resign from her position with the Law Offices of Adam S.

8   Kutner on August 10, 2005.

9          In August of 2005 the Plaintiff retained the law firm of Bailus, Cook & Kelesis. In January of 2006

10  she then filed a complaint with the Nevada Equal Rights Commission ("NERC") based on the Defendant's

11  actions. The Plaintiff's claim consisted of a hostile work environment that included humiliating,

12  embarrassing and inhumane treatment. The Defendant's behavior consisted of continuously attempting to

13  hit the Plaintiff with a golf club, hitting her with a phone headset, keeping her in his office against her will,

14  and talking about his sexual conquests. The Defendant also told the Plaintiff how he, "hated women with

15  big breast, that they were disgusting, and preferred boobs that fit in his hands." The Defendant also stated

16  that, "blacks and Mexicans were dumb, lazy and not to be trusted." These comments and actions were the

17  basis for the Plaintiff's complaint to NERC. (See EXHIBIT "1" attached hereto complaint filed with

18  NERC).

19          In late September or early October 2006 the Plaintiff was advised by Bailus, Cook & Kelesis  that

20  they would not be filing a lawsuit. The Plaintiff was then referred to Habbas, Bognar & Associates.

21  However, the Plaintiff never signed a retainer with Habbas, Bognar & Associates at that time and instead

22  was referred to the Law Office of Daniel Marks. The Plaintiff scheduled a meeting with Daniel Marks, Esq.

23  in late October and signed a retainer with Daniel Marks, Esq. on October 25, 2006.

24          Plaintiff received a "right to sue" letter on August 3, 2006 and filed a complaint in State Court on

25  October 26, 2006. (See Exhibit "2" Right to Sue letter). In response to the filing of the Plaintiff's complaint

26  the Defendant filed a Motion for Terminating Sanctions Due to Bad Faith Conduct and a Motion to

27  Disqualify the Plaintiff's Counsel on November 21, 2006 after removal to the U.S. District Court. The

28  motion alleges that the Plaintiff's claim should be dismissed due to the improper actions of a former

3

1   employee, Lanette Begley, of the Law Offices of Adam S. Kutner, **not the Plaintiff's actions.** In fact, the

2   Plaintiff was not even working at the Law Offices of Adam S. Kutner at the time Ms. Begley allegedly

3   taped these confidential meetings.

4          The Plaintiff has stated in a sworn affidavit that she did not partake in the tape recordings allegedly

5   made by Ms. Begley, that she did not tell Ms. Begley to tape record any meetings or conversations, and

6   that she was shocked when Ms. Begley informed her of her actions. Further, the Plaintiff **never** listened

7   to any tape recordings made by Ms. Begley, nor did she read any transcripts of any taped conversations,

8   nor was she advised by Ms. Begley of the contents of the recording. (See EXHIBIT "3" affidavit of Vikki

9   Ralev).

10         Moreover, the Plaintiff denies ever speaking to Ms. Begley about the tapes over the phone. The

11   Defendant's motion claims that their witnesses heard Ms. Begley speaking to the Plaintiff on the phone.

12   However, they fail to list any times or dates when theses alleged conversations took place. These

13   statements by Patty Gutierrez, Veronica Gomez, Christina Godoy are hearsay statements. (See Exhibit "4"

14   attached hereto of the declarations of Gutierrez, Gomez, and Godoy). They are statements relating to

15   overheard conversations in which the Plaintiff's portion of the conversation could not be heard.

16         The truth is, Defendant's witnesses do not know what the Plaintiff did or did not hear. These

17   witnesses are assuming that the Plaintiff was on the phone to Ms. Begley. They are further assuming that

18   the Plaintiff listened to the tapes based on alleged conversations they had with Ms. Begley. Again, this is

19   all speculative on their part. The Plaintiff never listened to Ms. Begley's tapes nor was she ever told what

20   the substances of those recordings were. (See EXHIBIT "3").

21         Moreover, Daniel Marks, Esq. has never heard or been told about the substance of the tapes. In fact,

22   this motion was the first instance that Daniel Marks, Esq. had ever heard that there was a tape. (See

23   EXHIBIT "5" affidavit of Mr. Daniel Marks, Esq.) Additionally, Mr. Marks has never discussed any of

24   these issues with Ms. Begley. Mr. Marks first became involved with the matter in late October when

25   retained by the Plaintiff,  so there was no way for him to have been involved with any misconduct back

26   in May of 2006. Moreover, Mr. Marks does not represent Ms. Begley. Lastly, there is no substantiated

27   evidence that any attorney-client information was communicated to the Plaintiff, Mr. Marks, or Habbas,

28   Bognar & Associates.

II.   **LEGAL ARGUMENT**

A.   **NEITHER THE PLAINTIFF NOR HER COUNSEL PARTOOK IN ANY BAD FAITH CONDUCT AND THEREFORE SHOULD NOT BE SANCTIONED.**

The Plaintiff is well aware that the Court has an inherent power to impose sanctions against both attorneys and parties for "bad faith" conduct in litigation. **Chambers v. NASCO, Inc.,** 501 U.S. 32, 111 S.Ct. 2123 (1991). However, there is no bad faith conduct by the Plaintiff or her counsel in this case. In **Chambers**, the petitioner/owner refused to consummate a sale he had entered into. The owner and his attorney then attempted to place the property beyond the control of the court, by creating a trust. The owner and his attorney never told the court of their actions. The Court discovered what the owner and his attorney had done and warned them that their conduct was unethical. Regardless, the owner continued to challenge the court's injunction, filed baseless motions and stalled the proceedings. Thus, the court held that attorney's fees were proper where the petitioner attempted to defraud the court, repeatedly defied the preliminary injunctions and continuously filed meritless motions and pleadings.

The facts of this case are nothing like those in **Chambers**. First, unlike the owner in **Chambers** the Plaintiff here has done nothing wrong. She has not taken part in any illegal or unethical behavior. She has not taken any actions against any court order. Further, she has not acted inappropriately outside of the court's presence. Moreover, the petitioner/owner in **Chambers** behaved in a manner that was unethical and illegal and was sanctioned by the Court for his behavior. His sanctions were the direct result of his **own** conduct.

In this case the Defendant seeks to have Plaintiff penalized or sanctioned for someone else's conduct, **not her own**. It would be unfair for the Plaintiff to suffer the consequences of another's actions. Therefore, the Plaintiff should not be sanctioned for the alleged conduct of Ms. Begley when she did nothing wrong.

In addition, Daniel Marks, Esq. did nothing wrong. He never informed anyone to record confidential communications. Mr. Marks had no idea that a tape even existed until receiving the Defendant's motion. Lastly, Mr. Marks has never heard the tape recording or read any transcriptions of the tape. Mr. Marks has also never been advised of the statements or comments on the recording. Therefore, there was no unethical or illegal acts committed by Mr. Marks and he should be able to proceed free of any

5

1 | court sanctions including disqualification.

2 |       The Defendant also relies on a series of other cases in which the court sanctioned the parties for

3 | their direct "bad faith" conduct. In **B.K.B. v. Maui Police Dept.**, 276 F.3d 1091 (9th Cir. 2002), the court

4 | imposed sanctions against the County for presenting evidence of the plaintiff's sexual history, which

5 | violated Fed. R. Evid. 412(c). The District Court held that the defense counsel had been more than

6 | reckless with regards to the requirements of the Rule. Thus, the court held, "sanctions are available if the

7 | court specifically finds bad faith or conduct tantamount to bad faith." Further, that "sanctions are available

8 | for a variety of types of wilful actions, including recklessness when combined with an additional factor

9 | such as frivolousness, harassment or an improper purpose. **Id.** at 1108.

10 |       Again, this case is nothing like **Maui Police Dept.**. In this case neither Mr. Marks nor the Plaintiff

11 | acted in bad faith. Further, they never instructed Ms. Begley to record confidential conversations or listened

12 | to the tape recordings. Neither the Plaintiff nor Daniel Marks, Esq. ever wilfully acted in bad faith and

13 | therefore should not be sanctioned. Lastly, Habbas, Bognar & Associates never instructed Ms. Begley to

14 | record confidential  communications and have no knowledge of the nature of those communications.

15 |       All of the cases the Defendants cite in their motion involves  willful abuse of the judicial process

16 | or bad faith conduct by the party involved. (See also **B.K.B. v. Maui Police Dept.**, 276 F.3d 1091 (9th Cir.

17 | 2002); **Mark Industries, Ltd. v. Sea Captain's Choice, Inc.** 50 F.3d 730 (9th Cir. 1995); **Chambers v.**

18 | **NASCO, Inc.**, 501 U.S. 32, 111 S.Ct. 2123 (1991)). The cases mentioned are not similar to this case as

19 | the Plaintiff never acted unethically or illegally, nor did the Plaintiff or counsel ever act in bad faith. Thus,

20 | there are no grounds to sanction either the Plaintiff or her counsel.

21 |     **B.**    **THE PLAINTIFF'S CASE SHOULD NOT BE DISMISSED FOR SOMEONE**

22 |              **ELSE'S BAD FAITH CONDUCT.**

23 |       The Plaintiff did not act in bad faith, and she should be able to proceed with her case. The

24 | Defendant asks for the Plaintiff's case to be dismissed based on bad faith conduct. The Defendant first

25 | cites, **Combs v. Rockwell International Corp.**, 927 F.2d 486 (9th Cir. 1996). In **Combs**, the court held

26 | that dismissal was proper where Combs signed a revised deposition and swore, under penalty of perjury,

27 | that he had reviewed the transcripts and had himself made the changes. However, Combs never read the

28 | transcripts and his attorney was the individual who made over thirty-six material changes not himself. **Id.**

1   at 487. The court found that this behavior was a violation of the federal rules and thus dismissal was an

2   appropriate sanction for falsifying a deposition.

3        Unlike **Combs**, the Plaintiffs here did not violate any federal rule nor did she lie under penalty and

4   perjury. The Plaintiff did nothing wrong. The Defendant has no proof that the Plaintiff instructed Ms.

5   Begley to record confidential conversations of the Defendant nor do they have proof that she ever heard

6   the tape recordings. Further, Mr. Marks has not heard any of the recorded conversations. Mr. Marks never

7   advised the Plaintiff or anyone to partake in illegal or unethical conduct. Lastly, Mr. Marks nor the Plaintiff

8   has violated any federal, state, or local rules. Thus, again there have been no acts of bad faith so there are

9   no grounds to dismiss the Plaintiffs action.

10       The next case the Defendants cite is **Hull v. Municipality of San Juan**, 365 F.3d 98 (2004). In

11   **Hull**, the court held that the Plaintiff's case was properly dismissed where he failed to reveal prior similar

12   injuries and lawsuits when asked. Further, the Court found that the fraud was deliberate and substantial.

13   Again, this case is nothing like **Hull**. Neither the Plaintiff nor her counsel ever committed any act of fraud.

14   They never failed to disclose information regarding the taped conversations because they never had any

15   information to disclose. Therefore, there are no grounds to dismiss the Plaintiff's case when she has not

16   violated any rules and did not falsify any documents.

17       The Defendant then cites **Anheuser-Busch, Inc. v. Natural Beverage Distributors**, 69 F.3d 337

18   (9th Cir. 1995) and **Wyle v. R.J. Reynolds Industries, Inc.,** 709 F.2d 585 (1983). These cases are not

19   relevant to the facts of the immediate case. In **Anheuser**, the court held that dismissal of the Defendant's

20   case was proper because the Defendant wilfully concealed the existence of relevant documents and the

21   Plaintiff was prejudiced by those actions. The court stated that, "dismissal is warranted where, a party has

22   engaged deliberately in deceptive practices that undermines the integrity of the judicial proceedings."

23   **Anheuser** at 348. **Wyle** similarly held, "courts have inherent power to dismiss an action when a party has

24   wilfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of

25   justice." **Id.** at 589.

26       In this case the Plaintiff has not deliberately engaged in any wilful deceptive practices. She did not

27   take part in any of Ms. Begley's conduct. Further, she had no idea that Ms. Begley was going to record

28   confidential conversations of the Defendants. Lastly, the Plaintiff has not concealed any relevant

7

1  documents. Therefore, the Plaintiff did not undermine the integrity of the judicial proceedings and should

2  not be penalized for Ms. Begley's conduct.

3  **C.     HABBAS, BOGNAR & ASSOCIATES HAVE NOT ENGAGED IN ANY UNETHICAL OR
        ILLEGAL BEHAVIOR AND THEREFORE SHOULD NOT BE DISQUALIFIED.**

4

5         The Plaintiff nor her counsel have engaged in any unethical or illegal behavior. Although the

6  Defendant would have you believe otherwise, there is no proof that Habbas, Bognar & Associates violated

7  any rules. Moreover, they have categorically denied ever instructing Ms. Begley to tape any confidential

8  information, or ever hearing any of those recordings. Instead, the Defendant is asking the court to rely on

9  Declarations made by the Defendants' current employees which consists largely of hearsay statements and

10  speculations.

11        The Defendant lists a variety of cases regarding the court's ability to disqualify an attorney. One

12  of the many cases cited is **Richardson v. Hamilton Int'l Corp.**, 469 F.2d 1382 (3rd Cir. 1972), which

13  states in part that, "a court may disqualify an attorney for not only acting inappropriately but also for failing

14  to avoid the appearance of impropriety." (See page 11 of Defendant's Motion to Disqualify Plaintiff's

15  Counsel). They go on to cite **Willmes v. Reno Mun. Court**, 118 Nev. 831, 59 P.3d 1197 (Nev. 2002) in

16  which the court held that, "to prevail on a motion to disqualify, the moving party must first establish at

17  least a reasonable possibility that some specifically identifiable impropriety did in fact occur." However,

18  the Defendant fails to cite a number of other cases that stress the importance of not disqualifying an

19  attorney cavalierly or without a high standard of proof.

20        In **U.S. of Am. v. Schafer**, 2006 U.S. Dis. LEXIS 82631 (E.D. Cal. 2006), the court held that:

21             "A disqualification inquiry, particularly when instigated by an opponent,
               presents a palpable risk of unfairly denying a party the counsel of his

22             choosing. Therefore, not withstanding the fundamental importance of
               safeguarding popular confidence in the integrity of the legal system,

23             **attorney disqualification**...is a sanction that must not be imposed
               cavalierly."

24

25  Thus, the court should not decide to disqualify an attorney hastily or with disregard. It is a serious matter

26  and must be handled with great care.

27        It has also been held that "The moving party bears a high standard of **proof** to show that

28  disqualification is warranted." See **United States v. Decay**, 406 F. Supp. 2d 679, 683 (E.D. La. 2005);

1  **Cramer v. Sabine Transp. Co.**, 141 F. Supp. 2d 727, 730 (S.D. Tex. 2001); **Tessier v. Plastic Surgery**

2  **Specialist, Inc.**, 731 F. Supp. 724, 729 (E.D. Va. 1990). Again, the court is stressing that this is not a

3  matter to be taken lightly and the moving party has a **high standard of proof**.

4        In this case the Plaintiff's counsel has not acted inappropriately. Habbas, Bognar and Associates

5  did not tell Ms. Begley to tape any conversation between any parties. More importantly, they never listened

6  to any tape recordings, they never participated in any meeting to discuss the recordings, and they never

7  advised Ms. Begley to destroy any tapes. Lastly, the Defendants cannot specifically identify an improper

8  act on behalf of Habbas, Bognar and Associates. The Defendants vaguely refer to times and dates they

9  **think** the Plaintiff's counsel heard the tapes but they clearly do not **know** if they did hear the tapes. Most

10  importantly, they have no evidence to support any of the theories of disqualifications.

11        In addition, disqualifying an attorney is a serious matter and the Defendant's Declarations by

12  current employees does not meet the high standard of proof to disqualify Habbas, Bognar & Associates.

13  Therefore, we respectfully request that the Court deny the Defendant's Motion to Disqualify either of the

14  Plaintiff's two Counsels.

15  **D.**    **PLAINTIFFS' COUNSEL DID NOT VIOLATED NRS 200.650 UNAUTHORIZED,**

16          **SURREPTITIOUS INTRUSION OF PRIVACY BY LISTENING DEVICE PROHIBITED**

17        There is absolutely no evidence that either of the Plaintiff's counsel ever advised Ms. Begley to

18  hide a tape recorder in the conference room of the Defendant's office. Further, neither of Plaintiff's

19  Counsel ever listened to any tape recording and they never advised Ms. Begley to destroy any recordings.

20  Thus, they did not intrude the privacy of anyone by listening to or monitoring any unauthorized

21  conversation. There is no evidence to support the allegations made by the Defendant's current employees.

22  NRS 200.690 specifically states that penalties are imposed on, " A person who wilfully and knowingly

23  violates NRS 200.620 to 200.650." In this case Habbas, Bognar & Associates had no knowledge Ms.

24  Begley was going to record the Defendant's confidential meeting. They also never advised Ms. Begley to

25  hide a tape recorder to obtain confidential information. Therefore, Habbas, Bognar & Associates did not

26  knowingly or wilfully violate NRS 200.650 and cannot be penalized.

27  / / / /

28  / / / /

1    **E.    PLAINTIFFS' COUNSEL DID NOT VIOLATE THE MODEL RULES OF
          PROFESSIONAL CONDUCT**

2

3         At no time did Habbas, Bognar & Associates or Daniel Marks, Esq. ever violate the Model Rules

4    of Professional Conduct. Rule 8.4(a) of the Model Rules of Professional Conduct states that it is

5    professional misconduct for a lawyer to: "Violate the Rules of Professional Conduct, knowingly assist or

6    induce another to do so, or do so through the acts of another." Neither the Plaintiff nor any of her counsel

7    violated or attempted to violate the Rules of Professional Conduct or knowingly assisted or induced

8    another to do so.

9         In this case, neither Daniel Marks, Esq. or Habbas, Bognar & Associates had knowledge of Ms.

10   Begley's intentions to tape record confidential conversations. Moreover, they never assisted or induced Ms.

11   Begley to record the Defendant. Ms. Begley's alleged actions are not the result of Habbas, Bognar &

12   Associates. There is no evidence that the Plaintiff knew about the taping, condoned the taping, listened to

13   the tape, or reviewed any information concerning the statements of the tape. For the Defendant to try to

14   hold the Plaintiff and her counsel accountable for the alleged acts of another independent individual would

15   be completely improper and unjust.

16        Neither of Plaintiff's counsel violated Rules 3.4 or 3.3 of the Model Rules of Professional Conduct.

17   First, neither Habbas, Bognar & Associates nor Daniel Marks, Esq. ever unlawfully obstructed the

18   Defendant's from accessing any evidence nor did they destroy or conceal any evidence. The Defendant

19   alleges that Plaintiff's counsel knew about the taping and had a duty to disclose this information to the

20   Defendant. However, this could not be farther from the truth. Not only did counsel not know about the

21   recordings they most definitely never advised Ms. Begley to destroy the tapes. Second, neither Daniel

22   Marks, Esq. nor Habbas, Bognar & Associates knew Ms. Begley intended to engage in any of the conduct

23   complained about by the Defendant.

24   **F.    THE LAW OFFICE OF DANIEL MARKS DID NOT KNOW ANY RECORDING
          EXISTED AND DOES NOT KNOW THE CONTENTS OF THE RECORDINGS.**

25

26        Mr. Daniel Marks **did not** participate in the confidential recordings. Further, Mr. Marks has never

27   listened to the recordings or been informed about the contents of those recordings. Ms Ralev is the Plaintiff

28   in this case. MS. Ralev had no knowledge of Ms. Begley's alleged conduct. The Defendant's rely on

1   **Gregori v. Bank of America**, 207 Cal. App.3d 291, 300 (1989) in order to disqualify Mr. Marks but as

2   mentioned above the court requires, "a high standard of proof to show that disqualification is warranted."

3   (See **United States v. Decay**, 406 F. Supp. 2d 679, 683 (E.D. La. 2005); **Cramer v. Sabine Transp. Co.**,

4   141 F. Supp. 2d 727, 730 (S.D. Tex. 2001); **Tessier v. Plastic Surgery Specialist, Inc.**, 731 F. Supp. 724,

5   729 (E.D. Va. 1990). In **Gregori**, the court held that, " a court must not hesitate to disqualify an attorney

6   when it has satisfactorily established that he or she wrongfully acquired an unfair advantage that

7   undermines the integrity of the judicial process and will have a continuing effect on the proceedings before

8   the court." **Id.** at 300. In this case there is no evidence to support the allegations made by the Defendant's

9   employee. The Defendant wants the Court to disqualify Mr. Marks on "ASSUMPTIONS." (See page 17

10  of Defendant's Motion to Disqualify Plaintiff's Counsel). Unfortunately, assumptions do not satisfactorily

11  establish that an unfair advantage was acquired. Moreover, the courts have stressed  that disqualification

12  is not a matter to be taken lightly. Therefore, the Defendant's assumptions do not suffice to disqualify Mr.

13  Marks from representing the Plaintiff in this matter.

14  **III.    CONCLUSION**

15          The Plaintiff has clearly not acted in bad faith nor has she wilfully engaged in deceptive practices.

16  The Plaintiff had no idea of Ms. Begley's intentions. She did not instruct Ms. Begley to tape record the

17  Defendant's private conversations. More important, she never listened to the tapes or read any transcripts

18  from the tapes. The Defendants base their entire argument on Declarations made by the Defendant's current

19  employees. However, the Defendant's employees list no specific time, dates, or locations as to when the

20  Plaintiff allegedly listened to the recordings. They are not positive that Ms. Begley was speaking to the

21  Plaintiff "every morning" as they were not part of those conversations. Further, they were not at the alleged

22  meeting at the "coffee shop" that the Plaintiff supposedly heard the tape recordings. Also, they could not

23  possibly hear what the Plaintiff stated when she was allegedly on the other side of a phone call with Ms.

24  Begley.

25          Mr. Marks should also not be disqualified. First, he instructed Ms. Begley to hide a tape recorder

26  in the Defendant's conference room. He has also never heard the recordings or read anything pertaining

27  to information on the recordings. Further, there was not failure to disclose on behalf of the Plaintiff or her

28  counsel as they had no information relating to the confidential tape recordings. Neither the Plaintiff not

1   her counsel had any thing to do with Ms. Begley's conduct and should not be prevented of their right to

2   bring forth their claim.

3          Lastly, Habbas, Bognar & Associates have not engaged in any unethical or illegal behavior. Further,

4   they never violated any Model Rules of Professional Conduct. Further, the Defendant's have failed to meet

5   the high standard of proof needed to disqualify the Plaintiff's counsel. Therefore, the Plaintiff respectfully

6   requests that the Court deny the Defendant's Motion for Terminating Sanctions Due to Bad Faith Conduct

7   and their Motion to Disqualify Plaintiff's Counsel.

8          DATED this ___ day of December 2006.

9

10                                         LAW OFFICE OF DANIEL MARKS

11

12                                         _____
                                           DANIEL MARKS, ESQ.
13                                         Nevada State Bar No. 002003
                                           302 East Carson Avenue, Suite 702
14                                         Las Vegas, Nevada 89101
                                           Co-Counsel for Respondent
15                                                      -and-
                                           HABBAS, BOGNAR & ASSOCIATES, P.C.
16                                         MICHAEL J. BOGNAR, ESQ.
                                           Nevada State Bar No. 008966
17                                         528 South Casino Center Blvd., 3rd Floor
                                           Las Vegas, Nevada 89101
18                                          Co-Counsel for Plaintiff

19

20

21

22

23

24

25

26

27

28

                                           12

# AFFIDAVIT OF LANETTE BEGLEY

STATE OF NEVADA              )
                             )    ss.
COUNTY OF CLARK              )

LANETTE BEGLEY, being first duly sworn, deposes and says:

1.  That I did not record a meeting between Adam Kutner and his attorney on May 10, 2006.

2.  That on May 10, 2006 Christina Godoy, a co-worker of mine at Mr. Kutner's office placed my digital recorder in the conference room of Mr. Kutner's office. She did so on her own initiative, and not at my direction. I retrieved the recorder from the conference room after the office had closed later that same evening.

3.  After retrieving the recorder from the conference room on the evening of May 10, 2006, I did not play it for anyone. I listened to the recording alone. The majority of the recording was blank.

4.  I have never played this recording for anyone, including my attorneys Habbas, Bognar & Associates or Daniel Marks, Esq.

5.  I have never discussed the contents of this recording with anyone, including my attorneys Habbas, Bognar & Associates or Daniel Marks, Esq.

6.  The recording was made on May 10, 2006.

7.  I retained the law firm of Habbas, Bognar & Associates to represent me on May 23, 2006.

8.  That my attorneys Habbas, Bognar & Associates have never instructed me to place a tape recorder in Mr. Kutner's conference room, office or business premises and secretly tape record a meeting between Mr. Kutner and his attorney Edwin Keller, nor any other persons.

9.  That I never played this recording for Vikki Ralev, my attorneys Habbas, Bognar & Associates or Daniel Marks, Esq.

1

10. That I never provided my attorneys Habbas, Bognar & Associates or Daniel Marks, Esq. with any recording of any conversations involving Mr. Kutner, his attorney, nor any other persons.

L̸ANETTE BEGLEY

Subscribed and sworn to before me this

____ day of _____, 2006.



Notary Public, in and for said
County and State

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
MARIA TERESA RODRIGUEZ
No. 04-100377-1
My Appointment Expires Apr. 6, 2010

P. 3                                                    HP LASERJET FAX                    Dec 08 2006 2:28

## AFFIDAVIT OF MICHAEL J. BOGNAR, ESQ.

STATE OF NEVADA      )
                     )   ss.
COUNTY OF CLARK      )

MICHAEL J. BOGNAR, ESQ., being first duly sworn, deposes and says:

1. That my law firm was retained by Lanette Begley on May 23, 2006. This was thirteen (13) days after the subject recording was made.

2. That I have never instructed Lynette Begley, nor any other client of my firm nor any other person to record any conversations involving Mr. Kutner nor any other persons.

3. That I have never been provided with any recording of any conversations involving Mr. Kutner, his attorney nor any other persons.

4. I have never been informed of, nor provided with the contents of any recording involving Mr. Kutner, his attorney, nor any other person.

5. I have never discussed the contents of the recording with Daniel Marks, Esq nor any other person.

6. I have not gained any tactical advantage as a result of the recording, as I have never been made aware of its contents.

MICHAEL J. BOGNAR, ESQ.

Subscribed and sworn to before me this
___8___ day of _December_ 2006.

Notary Public, in and for said
County, State

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
MARIA TERESA RODRIGUEZ
No. 06-105377-1
My Appointment Expires Apr. 6, 2010

1

# AFFIDAVIT OF OMAR I. HABBAS, ESQ.

STATE OF NEVADA           )
                          )      ss.
COUNTY OF CLARK           )

OMAR I. HABBAS, ESQ., being first duly sworn, deposes and says:

1.   That my law firm was retained by Lanette Begley on May 23, 2006. This was thirteen (13) days after the subject recording was made.

2.   That I have never instructed Lynette Begley, nor any other client of my firm nor any other person to record any conversations involving Mr. Kutner nor any other persons.

3.   That I have never been provided with any recording of any conversations involving Mr. Kutner, his attorney nor any other persons.

4.   I have never been informed of, nor provided with the contents of any recording involving Mr. Kutner, his attorney, nor any other person.

5.   I have never discussed the contents of the recording with Daniel Marks, Esq nor any other person.

6.   I have not gained any tactical advantage as a result of the recording, as I have never been made aware of its contents.


_____
OMAR I. HABBAS, ESQ.


Subscribed and sworn to before me this
8 day of December, 2006.

_____
Notary Public, in and for said
County and State

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
Nr. 06-106372-1
MARIA TERESA RODRIGUEZ
My Appointment Expires Apr. 8, 2010

1

1

## Department of Employment, Training & Rehabilitation

| | |
|---|---|
| DETR Home Page | |
| Age Discrimination | |
| Americans with Disabilities Act | |
| Fact Sheet and Frequently Asked Questions | |
| Federal Equal Employment Opportunity (EEO) Information | **NERC** |
| Mediation | |
| National Origin Discrimination | |
| NERC Home Page | **Intake Inquiry Form** |
| Nevada JobConnect | |
| Office Locations | |
| Pre-Employment Guide | |
| Pregnancy Discrimination | Click here to download |
| Race - Color Discrimination | Adobe Acrobat Reader |
| Religious Discrimination | |
| Sexual Harassment | |

A proud member of Nevada JobConnect

| Home | Site Map | Search | Feedback | FAQ | Employers | Jobseekers |

Spanish    French    German    English

---

**Intake Inquiry Form:**

State of Nevada
Department of Employment, Training & Rehabilitation
**Nevada Equal Rights Commission**

Before completing this form, please contact the nearest Equal Rights Commission Office for instructions

**Las Vegas - NERC**
Phone (702) 486-7161

**Reno - NERC**
Phone (775) 688-1288

**Intake Inquiry Form**

The Nevada Equal Rights Commission is charged with the enforcement of employment, housing and public accommodations, state and federal discrimination laws, under NRS 233 and 613 inclusive; Title VII of the Civil Rights Act of 1964, as amended; Age Discrimination in Employment Act of 1967, as amended; and Equal Employment Opportunity Commission procedural regulations; housing NRS 118 and Public Announcement NRS 651.

NOTE: Your complaint must be filed within 180 days from the last alleged discriminatory act. The company against whom you are claiming discrimination must employ a total of 15 or more employees (total workforce - Nevada and elsewhere).

*** Fields marked with an asterisk "*" are required. *** Please enter all dates as: MM/DD/YYYY.

| Section A: | | | |
|---|---|---|---|
| *Mr./Mrs.: | Ms. | | |
| *First Name: | Vikki | *Last Name: | Ralev |
| *Birth Date: | | | |

10/28/1954

Mailing Address:

| | | | |
|---|---|---|---|
| *Street: | 6346 W. Viking Road | Apt/Space/Room: | |
| *City: | Las Vegas | *State: | NV |
| *Zip Code: | 89103 | Email: | vikkiralev@aol.com |
| Home Phone: | (702) 683-3035 | Work Phone: | (702) 644-2378 |

Do you need the assistance of an interpreter?: Yes: ☐     (If YES, what language?:)

## Section B:

| | | | |
|---|---|---|---|
| *Company Name: | Adam S. Kutner & Associates | *Company Phone: | (702) 382-0000 |
| | (Name of the company that you believe discriminated against you.) | | |

Physical Address:

| | | | |
|---|---|---|---|
| *Street: | 1137 S. Rancho Drive, #A | Apt/Space/Room: | |
| *City: | Las Vegas | *State: NV     *Zip Code: | 89102 |

## Section C:

Give the name of someone who does not live with you and would be able to help us reach you.

| | | | |
|---|---|---|---|
| Relationship: | Friend | Telephone: | (702) 245-1822 |
| First Name: | Maria | Last Name: | Pulido |

Physical Address:

| | | | |
|---|---|---|---|
| Street: | 1120 Fay Blvd | Apt/Space/Room: | |
| City: | Las Vegas, Nevada | State: NV     Zip Code: | 89108 |

## Section D:

| | | | |
|---|---|---|---|
| *Hire Date: | 01/23/2004 | Ending Date: | 08/10/2005 |
| *Date of alleged Discriminatory act: | 08/10/2005 | *Present/ending position title: | Legal Asst/Ofc Mgr/Leg Dir |
| *Present/Ending Pay: | $ 75,000.00 (enter as: 00.00) | *per | Annually |

## Section E:

This is a complaint of discrimination based upon:
(Mark only the reasons which you believe caused the discriminatory act(s) that you are claiming.)

☑ Race
Remarks against African/Amer & Mexicans

☐ Color

☐ Religion

☐ Disability

☐ Age (40 and over)

☐ National Origin

☑ Sex
Female

☐ Sexual Orientation

☑ Retaliation
Repeated offensive threatening lewd  remarks

If box checked, explanation is required in associated text box.

## Section F:

Mark only those actions allegedly taken against you AND the date of last alleged occurrence:

| | | | |
|---|---|---|---|
| ☑ Demotion | 08/10/2005 | ☑ Discharge | |
| ☐ Lay off | | ☐ Fail to Hire | |
| ☑ Harassment | 08/10/2005 | ☑ Forced Resignation | 08/10/2005 |
| ☐ Fail to Promote | | ☑ Sexual Harassment | 08/10/2005 |

☐ Failure to Compensate      ☑ Fall to Represent (Union)

☐ Failure to Accommodate

☐ Pregnancy/Maternity (leave forced or denied)

☑ Terms & Conditions of Employment (brief explanation)    | Please select one ▼ |

forced to accept hostile work environmt

If box checked, explanation is required in associated text box.

## Section G:

List the name(s) of the individual(s) that you are claiming were involved in the alleged discrimination:

| First Name: | Adam | Last Name: | Kutner | Job Title: | Attorney/Owner/Supervisor |
|---|---|---|---|---|---|
| First Name: | | Last Name: | | Job Title: | |
| First Name: | | Last Name: | | Job Title: | |

## Section H:

What is the name of the company's Human Resources or Personnel Manager?

| First Name: | Amy | Last Name: | Stovall | Telephone Number: | (702) 382-0000 |
|---|---|---|---|---|---|

## Section I:

List the name(s) of anyone who witnessed, observed, and/or has knowledge of the event(s) that you are claiming were acts of discrimination. Give the names of those people who would willingly give a statement and would support you as your witness. NOTE: All witness testimony in this process is voluntary.

| First Name: | La Donna | Last Name: | Melendez |
|---|---|---|---|
| Address: | 5436 Del Ray | | |
| City: | Las Vegas | State: | NV |
| Zip Code: | 89146 | Telephone Number: | (702) 292-0363 |

| First Name: | Barbara | Last Name: | Balatbat |
|---|---|---|---|
| Address: | 1134 Casady Hollow Avenue | | |
| City: | Las Vegas | State: | NV |
| Zip Code: | 89012 | Telephone Number: | (702) 567-0583 |

| First Name: | Paty | Last Name: | Gutierrez |
|---|---|---|---|
| Address: | 3863 W. Irvin Avenue | | |
| City: | Las Vegas | State: | NV |
| Zip Code: | 89141 | Telephone Number: | (702) 403-7474 |

| First Name: | Paula | Last Name: | Fisher |
|---|---|---|---|
| Address: | 939 Paisley Street | | |
| City: | Las Vegas | State: | NV |
| Zip Code: | 89145 | Telephone Number: | (702) 242-4811 |

| First Name: | Francine | Last Name: | Kritisch |
|---|---|---|---|
| Address: | 1508 Mancha | | |

| City: | Boulder City | | State: | NV |
|---|---|---|---|---|
| Zip Code: | | | Telephone Number: | (702) 293-0104 |

**Section J:**

Complete these sentences:*** All fields are required

1) I was hired by company [Adam S. Kutner & Associates] on or about [01/23/2004]

Name of Company/business

as a [Legal Asst/Ofc Mgr/Leg Dir] . While employed there, I was subject to

1)forced to repeatedly listen to Mr. Kutner make lewd sexual remarks about "big boobs" and "how ho likes girls with little boobs that fit in his hand" & 2) derogatory stmts about African/Amer & Mexican/Spanish women being stupid & shitty 3) told to review female clients anatomy for dates w/Mr. Kutner 4) repeated intimidating, threatening, offensive & unwelcome sexual behavior on a daily basis 5)repeated hostile work

(Describe the type of discrimination/conditions that you are alleging happened)

by [Adam Kutner]                                      my [direct supervisor]

(The primary person in your complaint)              (That person's job title - co-worker, supervisor, etc.)

After the last alleged discriminatory event, I filed my complaint with the Nevada Equal Rights Commission.

2) The company explained that I was treated in this way because:

when reported to the Legal Administrator or other attorneys in the office, I was told "That's the way he is & he is never going to change" & to work there "You just had to accept it", no matter repeatedly lewd, intolerable, offensive, threatening or hostile he made the working environment.

3) I believe this way because:

Mr. Kutner explained that women & minorities were inadequate, inferior & stupid & he felt that he could threaten, bully & intimidate women to do what he wanted. I was told numerous times this with his lewd & vulgar behavior, even when I objected to such demeaning assaults. He felt that he had a right to treat me & other women employees this way because he "he wrote my F'ing paycheck"& "We were to do as we were

4) Explain the alleged discriminatory event(s) that you have marked in Section E. Please include who did what, who was there, what happened, when it happened, where it happened, what was said, etc. Please be as brief as possible.

I was present in Mr. Kutner's ofc sitting on the black sofa w/Paty Gutierrez, Barbara Balatbat, Paula Fisher, LaDonna Melendez & others when he was discussing the fact that he did not like"big boobs on his girlfriends;he accused me of pulling a "Sharon Stone", stating that he could see up my skirt, finding his behavior offensive, I tried to leave his ofc, but was told to get "F'ing ass back in there & stay until I was F'ing



| Home | Site Map | Search | Feedback | FAQ | Employers | Jobseekers |

Department of Employment, Training and Rehabilitation
Nevada Equal Rights Commission
1515 E. Tropicana, Suite 590
Las Vegas, NV 89119-6522

E-mail



Contact Webmaster



## Department of Employment, Training & Rehabilitation



DETR Home Page
Age Discrimination
Americans with Disabilities Act
Fact Sheet and Frequently
Asked Questions
Federal Equal Employment
Opportunity (EEO) Information
Mediation
National Origin Discrimination
NERC Home Page
Nevada JobConnect
Office Locations
Pre-Employment Guide
Pregnancy Discrimination
Race - Color Discrimination
Religious Discrimination
Sexual Harassment

# NERC

## Intake Inquiry Form





Click here to download
Adobe Acrobat Reader



A proud member of
Nevada JobConnect

| Home | Site Map | Search | Feedback | FAQ | Employers | Jobseekers |

 Spanish   French   German   English

## Intake Inquiry Form:

State of Nevada
Department of Employment, Training & Rehabilitation
### Nevada Equal Rights Commission

Before completing this form, please contact the nearest Equal Rights Commission Office for instructions

**Las Vegas - NERC**
Phone (702) 486-7161

**Reno - NERC**
Phone (775) 688-1288

### Intake Inquiry Form

The Nevada Equal Rights Commission is charged with the enforcement of employment, housing and public accommodations, state and federal discrimination laws, under NRS 233 and 613 inclusive; Title VII of the Civil Rights Act of 1964, as amended; Age Discrimination in Employment Act of 1967, as amended; and Equal Employment Opportunity Commission procedural regulations; housing NRS 118 and Public Announcement NRS 651.

NOTE: Your complaint must be filed within 180 days from the last alleged discriminatory act. The company against whom you are claiming discrimination must employ a total of 15 or more employees (total workforce - Nevada and elsewhere).

*** Fields marked with an asterisk "*" are required. *** Please enter all dates as: MM/DD/YYYY.

### Section A:

*Mr./Mrs.: Ms.
*First Name: Vikki          *Last Name: Ralev
*Birth Date:

**2**

EEOC Form 161-B (3/98)　　　U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| | |
|---|---|
| To: Vikki Ralev<br>6346 W. Viking Rd.<br>Las Vegas, NV 89103 | From: Los Angeles District Office - 480<br>255 E. Temple St. 4th<br>Los Angeles, CA 90012 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 34B-2006-00305 | Legal Officer of the Day | (213) 894-1000 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

_____
**Olophius E. Perry,
District Director**

August 1, 2006
_____
*(Date Mailed)*

cc:　Edwin A. Keller, Esq., on behalf of ADAM S. KUTNER &
　　ASSOCIATES
　　Kamer Zucker & Abbott
　　3000 W. Charleston Blvd.
　　Las Vegas, NV 89102

　　Mark B. Bailus, Esq.
　　ATTN: Julie L. Sanpei, Esq.
　　Bailus. Cook & Kelesis, Ltd.
　　400 S. 4th St., Ste. 300
　　Las Vegas, NV 89101


RECEIVED
BY VB　| DATE 8-3-06

Enclosure with EEOC
Form 161 (3/98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 9 0 d ays o f t he d ate t his N otice w as m ailed t o y ou** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If y ou have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed f rom 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned ab ove, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

3

## AFFIDAVIT OF VIKKI RALEV IN SUPPORT OF
## HER OPPOSITION TO PENDING MOTION

STATE OF NEVADA      )
                         ) ss.
COUNTY OF CLARK      )

I, Vikki Ralev, being duly sword does depose and say the following:

1.      That I am the Plaintiff in the foregoing action and as such I have sufficient knowledge with which to testify to the facts and circumstances surrounding this action.

2.      That I was hired by Defendant Adam S. Kutner's corporation on January 23, 2004 as a legal assistant.  My employment continued to August 10, 2005 when I was constructively terminated in my employment.

3.      That after leaving the employment of Adam Kutner on or about August 10, 2005 Affiant was represented by the law firm of Bailus, Cook & Kelesis, Ltd., located here in Las Vegas, Nevada.

4.      That at some point in late September or early October of 2006 I was advised by Bailus, Cook & Kelesis that they would not be filing my lawsuit. I was referred to Habbas, Bognar & Associates.  However, I never signed a retainer agreement with Habbas, Bognar & Associates, and instead I was referred to the Law Office of Daniel Marks.

5.      That on October 25, 2006 I signed a retainer with the Law Office of Daniel Marks andMr. Marks immediately filed a complaint on my behalf.

6.      That I have read the documents relating to the alleged secret taping by Lanette Begley, which form the basis for the Defendant's Motion for Sanctions and the Motion to Disqualify Counsel.

7.      That I had no knowledge prior to the alleged date of taping that Ms. Begley was going to tape any conversations between Adam Kutner and his counsel.  I have never heard the tape, nor have I seen any transcripts of any tape recordings between Adam Kutner and his counsel, nor was I ever told of any of the substance of what was discussed between Adam Kutner and his counsel.

8.      That at some point, in May 2006, I was advised by Lanette Begley, another former employee of Adam Kutner, that Christina Godoy taped the conversation, but I was never

advised of the substance of the conversation or the surrounding events.  I immediately expressed my shock that Ms. Begley would undertake to do that.

9.    That I never spoke to Ms. Begley about the tapes over the phone.

10.   That to my knowledge, neither Bailus Cook & Kelesis, the Law Office Daniel Marks or Habbas, Bognar & Associates have ever heard the tape, seen transcripts of the tape or had any knowledge of the substance of the contents of the tape either before, or after its taping.

11.   That my case is separate and distinct from any other case relating to the Defendant.  There has been no consolidation or joinder in my case and I do not see any reason why I should be penalized in my choice of counsel or that my case should be dismissed based on the actions of another person, whom I have no control over, who is not my agent or represents me or my interest in any way.

12.   That at the time of the alleged taping I was not an employee of Adam Kutner and had not been an employee for approximately nine months.

13.   That the allegation Affiant spoke with Lanette Begley on a daily basis, contained in paragraph 12 of Patty Gutierrez' Affidavit, it is absolutely untrue. The Affidavit seems to imply that Ms. Begley came into Patty's office on a daily basis to say that she had spoken with me.  However, this paragraph does not give any times, dates or places when Ms. Begley allegedly communicated anything of substantive to me.

14.   That in paragraph 3 of Veronica Gomez' affidavit she states that in early 2006 she "overheard several telephone conversations between Ms. Begley and a former employee of Adam Kutner's, Vikki Ravlev".  However, since I was not working there at the time Ms. Gomez could not have overheard my side of any alleged telephone conversations. Furthermore, Veronica Gomez did not even work with me at the time I worked for Adam Kutner.

////
////
////

2

15.   That there is absolutely no evidence to support the draconian measures that Defendants are seeking in this case specifically the disqualification of my counsel. Therefore, I respectfully request there motion be denied.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

*Vikki Ralev*

VIKKI RALEV

SUBSCRIBED and SWORN to before me
this ___ day of December, 2006.

_____
NOTARY PUBLIC in and for said
COUNTY and STATE

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
THERESA J MUZGAY
No 03-2196-1
My Appointment Expires Jan 18, 2009

3

# 4

# DECLARATION OF PATTY GUTIERREZ

## DECLARATION OF PATTY GUTIERREZ

I, Patty Gutierrez, declare:

1.      Since April 1998 I have been employed by the Law Offices of Adam Kutner & Associates as a Legal Assistant/Marketing Director.

2.      From 2001 until June 2006 I worked with Lanette Begley, who managed Mr. Kutner's disbursal department.

3.      In or around January 2006, Ms. Begley told me that she and former employee, Vikki Ralev, had retained the law firm of Habbas Bognar & Associates to represent them with respect to claims they had against Mr. Kutner.

4.      From January 2006 until June 2006, Ms. Begley repeatedly told me that she and Ms. Ralev expected to receive millions of dollars in compensation as a result from suing Mr. Kutner, and she often asked if I would join them in their lawsuit. I declined the invitations.

5.      In or around March 2006, Ms. Begley told me that she had been experiencing panic attacks and had a heart condition. Prior to March 2006, Ms. Begley never complained to me about any health problems. Around that time, Ms. Begley also informed me Habbas Bognar & Associates had hired a private investigator to look into the backgrounds of Mr. Kutner and attorney David Fassett, with the law firm of Fassett & Cardoza.

6.      In the latter part of April 2006, Ms. Begley informed me that her attorney had filed a complaint against Mr. Kutner with the EEOC based on sexual harassment and discrimination. Ms. Begley said that she was nervous about whether or not Mr. Kutner would terminate her employment once he received a copy of the complaint.

7.      Two to three days later, Mr. Kutner received a copy of Ms. Begley's EEOC complaint. Ms. Begley told me that Mr. Kutner arranged to have his attorney, Edwin Keller, with

the law firm Kamer, Zucker & Abbott, meet at Mr. Kutner's office two days later in order to discuss the claims filed with the EEOC. Ms. Begley said that the meeting between Mr. Kutner and Mr. Keller was scheduled for 5:00 p.m. in Mr. Kutner's conference room.

8.    On May 10, 2006, at approximately 4:30 p.m. on the day Mr. Kutner was scheduled to meet Mr. Keller, I observed Ms. Begley pacing back and forth in front of the conference room area. Ms. Begley appeared very nervous, and kept entering and exiting my office, which was adjacent to the conference room. At approximately 5:00 p.m., I observed Mr. Kutner and Mr. Keller enter the conference room and shut the door behind them. Several minutes later I left work for the day. I do not know how long the meeting between Mr. Kutner and Mr. Keller lasted.

9.    The following morning, at approximately 9:30 a.m., a fellow employee, Christina Godoy, came into my office and proceeded to inform me that the night before, Ms. Begley had secretly tape recorded the entire meeting between Mr. Kutner and Mr. Keller. Ms. Godoy said that she had listened to the tape recording and could not believe the amount of evidence obtained. Ms. Godoy further told me that Mr. Kutner was going to be "destroyed." Ms. Godoy also stated Ms. Begley had been instructed by Habbas & Bognar to record Mr. Kutner's conversations with his attorney.

10.    Later that day, at approximately 12:00 p.m., Ms. Begley entered my office and boasted that she had secretly tape recorded the entire conference room conversation between Mr. Kutner which took place the night before. Shortly thereafter, Ms. Begley informed me that she and her attorney had listened to the entire tape recording, and were excited about the evidence that they had obtained.

11.     During the month following Ms. Begley's telling me about the secret tape recording, Ms. Begley came into my office on several occasions and said that her attorney intended on going to the media and exposing Mr. Kutner as being racist toward Hispanics.

12.     From approximately April 2006 until June 12, 2006 (the date Lanette Begley quit her job), Ms. Begley came into my office on a daily basis to tell me that she had spoken with Vikki Ralev and Barbara Balatbat before coming to work in order to provide them with an update on the latest events at the office, Mr. Kutner's activities, and the status of their claims against Mr. Kutner.  Ms. Begley's daily reports to me concerning her communications with Ms. Ralev and Ms. Balatbat also took place during the time Mr. Kutner's meeting with Mr. Keller was secretly tape recorded.

The foregoing is based upon my personal knowledge and if called to testify 1 could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _NOV 21, 2006_ , 2006          By: _____
                                                Patty Gutierrez

# DECLARATION OF VERONICA GOMEZ

## DECLARATION OF VERONICA GOMEZ

I, Veronica Gomez, declare:

1.       In August 2005, I began working for the law firm Adam S. Kutner, P.C. d/b/a Adam S. Kutner & Associates (the "Firm") as a Disbursal Representative, and I continue to be employed in that capacity.

2.       From August 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3.       In early 2006, I overheard several telephone conversations between Ms. Begley and Mr. Kutner's former employee, Vikki Ralev.  At that time, my desk was located adjacent to Ms. Begley's office, and she most always left her door open, and spoke loudly.  Additionally, Ms. Begley personally discussed with me her lawsuit against Mr. Kutner.

4.       Ms. Begley told me that me that Ms. Ralev filed a Complaint with the EEOC against Mr. Kutner and that she was going to receive a large amount of money.   I heard Ms. Begley frequently speak on the phone to Ms. Ralev about Mr. Kutner, including providing her with information regarding Mr. Kutner's office.  Ms. Begley was constantly trying to get other employees to join her campaign against Mr. Kutner.  Ms. Begley eventually asked me to pursue claims against Mr. Kutner, but I responded that I did not have any reason to sue Mr. Kutner.

5.       Prior to Ms. Begley filing her Complaint with the EEOC, she informed me that she had retained the same attorneys as Ms. Ralev and other former employees.  Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, and the dates and times of each conversation.  Ms. Begley told me that she was going to buy a house with the large settlement she received from the "mother fucker."  Also, at this time Ms. Begley instructed me not to work productively on Mr. Kutner's files so his collections would decrease.  I also observed Ms. Begley shredding Mr. Kutner's documents

while laughing aloud. I observed Ms. Begley shredding documents, and various checks which belonged to Mr. Kutner.

6.      In May 2006, I observed Ms. Begley giving her miniature tape recorder to employee Portia Barlow so she could tape record all of her meetings with Mr. Kutner's management. I observed both Ms. Begley and Ms. Barlow placing the tape recorder in their shoes and pockets at various times.

7.      At around the same time, Ms. Begley admitted to me that she wanted to intentionally set her car on fire to get rid of her old car and collect insurance money. Additionally, Ms. Begley informed me that she sued her previous employer for sexual harassment. I was becoming concerned with Ms. Begley's behavior, and tried to avoid getting involved; however, it was hard to avoid overhearing Ms. Begley's plans against Mr. Kutner because of the location of my desk, and she kept insisting on telling me everything.

8.      On May 10, 2006, I heard Ms. Begley tell Christina Godoy that Mr. Kutner, and his management were having a meeting later that evening and that she was not included. I heard Ms. Begley order Ms. Godoy to place the tape recorder in Mr. Kutner's conference room. I also heard Ms. Begley threaten Ms. Godoy that if she did not place the tape recorder in the conference room she would tell Mr. Kutner about a file that Ms. Godoy had made a mistake on, and Ms. Godoy would lose her job. Ms. Godoy then agreed to Ms. Begley's request. Ms. Begley told me that she wanted to secretly tape record the meeting so she could hear what Mr. Kutner intended to do regarding her complaint. Ms. Begley also told me that she was waiting for Mr. Kutner to terminate her because it would be better for her lawsuit against him.

9.      Later that evening, Ms. Begley called my cell phone several times in a state of panic asking me where Ms. Godoy was. I told Ms. Begley I was not aware of Ms. Godoy's

whereabouts. I then asked Ms. Begley what was wrong, and she told me that she had told Ms. Godoy to place the tape recorder behind the books in Mr. Kutner's conference room, but she could not locate it. Further, Ms. Begley told me that was very nervous that someone had found the tape recorder.

10.  The next day, Ms. Begley told Ms. Godoy and I to come into her office. Ms. Begley informed us that she had listened to the secret tape, and that she had heard Mr. Kutner's meeting with his attorney, Mr. Keller. Ms. Godoy and I then went into Ms. Begley's office and she asked us to close the door. Ms. Begley was excited about the contents on the tape, and told us that she had heard Mr. Keller advising Mr. Kutner on the pending lawsuits filed against Mr. Kutner by the group of claimants represented by the same attorney which Ms. Begley had retained. Additionally, Ms. Begley informed me that she heard Mr. Kutner and his attorney discussing possible settlement regarding one of the claimants. Further, Ms. Begley informed us that she intended to bring the secret tape recording to her attorney to let him listen to its contents.

11.   Ms. Begley told me that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording. Upon Ms. Begley's return from her alleged doctor's appointment she informed me that she had actually met with her attorney. Ms. Begley told me that her attorney had listened to the entire secret tape recording and her attorney advised her not to allow anyone to listen to the secret tape recording, not to talk to anyone regarding the tape, and ordered Ms. Begley to destroy the tape.

12.   At the close of work that day, Ms. Begley told Ms. Godoy and I to come outside with her and listen to the secret tape recording which she had obtained. Ms. Begley pressed play, and I heard Mr. Kutner conversing with his attorney regarding Ms. Begley. Further, I heard

settlement discussions concerning another claimant who had also retained the same attorneys as Ms. Begley. Shortly thereafter, we saw attorney David Fasset exiting the building where we were all standing, and Ms. Begley stopped the tape. Ms. Begley had tried on several occasions to play the secret tape recording for Ms. Godoy and I; however, we were always interrupted. Ms. Begley also told me that she had also played the secret tape recording to at least 6 other of Mr. Kutner's employees. Further, I heard Ms. Begley tell one of Mr. Kutner's employees that she had let one of the complainants who had retained the same attorney as Ms. Begley also listen to the secret tape recording.

13.    Shortly thereafter, Ms. Begley informed me that she had met Vikki Ralev at a local coffee shop, and played the secret tape recording to her.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _November 21_, 2006          By: _____
                                          Veronica Gomez

# DECLARATION OF CHRISTINA GODOY

## DECLARATION OF CHRISTINA GODOY

I, Christina Godoy, declare:

1.      On May 5, 2005, I began working for the law firm Kutner & Associates as a Disbursal Representative.   On June 16, 2006, I was promoted to Disbursal Manager, and I continue to be employed in that capacity.

2.      From May 5, 2005 until June 2006, I worked with and was under the supervision of Lanette Begley, who was Mr. Kutner's Disbursal Manager until she resigned in June 2006.

3.      In January 2006, Ms. Begley told me that she had retained an attorney and was looking to sue Mr. Kutner for harassment and discrimination.   Ms. Begley said that her attorney had instructed her to keep a daily journal memorializing her conversations with Mr. Kutner, along with the amount of money Mr. Kutner collected on a daily basis.

4.      In early April 2006, Ms. Begley called me into her office and informed me that she met with Mr. Kutner's former employees, Vikki Ralev, and Barbara Balatbat at a local coffee shop to discuss their allegations against Mr. Kutner.   Ms. Begley said that she had retained the law firm of Habbas & Nasseri, and that the same law firm was also representing Ms. Ralev and Ms. Balatbat.   Ms. Begley then told me that she intended to file harassment and discrimination claims against Mr. Kutner with the EEOC.   Ms. Begley claimed that her attorneys were "big," and that her case against Mr. Kutner would be "big money."   Additionally, Ms. Begley claimed that she was aware of several people who were filing similar claims against Mr. Kutner, and that they intended to file a class action  lawsuit.   During the same conversation, Ms. Begley maintained that she knew all about Mr. Kutner's insurance coverage regarding employee complaints.   Ms. Begley, who knew that I had previous insurance coverage experience, then asked me whether or not Mr. Kutner's insurance coverage was capped, and what amount of

funds could someone receive if a lawsuit was filed against Mr. Kutner for harassment and discrimination. At that time, Ms. Begley requested that Veronica Gomez, Portia Barlow, Kenia Onofre, and myself provide affidavits regarding how Mr. Kutner treated Ms. Begley. I told Ms. Begley that I would not provide her with an affidavit because her contentions were not true. I advised Ms. Begley to think about what she was doing, and that she should think of her family.

5.     After Ms. Begley informed me that she was going to file a lawsuit against Mr. Kutner, she began complaining to me on a daily basis about Mr. Kutner's behavior. I told Ms. Begley that if she did not like it, she should work somewhere else. Ms. Begley responded that she was going to stay until Mr. Kutner was forced to fire her.

6.     In mid April 2006, Ms. Begley asked Veronica Gomez, Kenia Onofre, and Portia Barlow and myself if we intended to join her in filing a complaint against Mr. Kutner. I told Ms. Begley that I had no intention of filing a complaint against Mr. Kutner. I do not know how Ms. Gomez, Ms. Onofre, or Ms. Barlow responded to Ms. Begley's question.

7.     Shortly thereafter, Ms. Begley told me that she was intentionally refusing to turn in her disbursal sheets to Mr. Kutner (as was customary), in an attempt to upset Mr. Kutner and force him to terminate her employment. Around this time, Ms. Begley showed me her attorneys' California website, Habbas, Nasseri & Associates, which listed a 1-800 number.

8.     In late April 2006, Ms. Begley informed me that she had been secretly tape recording her conversations regarding her medical issues with Jerry Donahue, Mr. Kutner's Managing Attorney, and with Office Manager, Cindy Erickson.

9.     In May 2006, Ms. Begley informed me that she had filed a complaint with the EEOC, and that Mr. Kutner would be receiving a copy of the complaint any day.

10.     Several days later, Ms. Begley said that Mr. Kutner had received a copy of her EEOC complaint.  Ms. Begley angrily told me that Mr. Kutner told her that he would no longer conduct meetings with her without other individuals being present.

11.     Shortly after Ms. Begley informed me that Mr. Kutner had received a copy of her EEOC complaint, she told me that Mr. Kutner had scheduled a meeting with his attorney, Ed Keller, to discuss the EEOC charges filed against him.  Ms. Begley said that she intended to secretly tape record Mr. Kutner's meeting with his attorney.

12.     Around this time, Ms. Begley also informed me that she had played the secret tape recording of her conversations with Jerry Donahue and Ms. Erickson to her attorney.  Ms. Begley played a portion of a tape recording between Mr. Donohue and Ms. Begley, and I heard Mr. Donahue discussing Ms. Begley's performance issues in a very professional manner.  I also heard Mr. Donahue advising Ms. Begley of her rights to seek FMLA protection if her health issues were a concern.

13.     On May 10, 2006, Mr. Kutner was scheduled to meet with his attorney, Mr. Keller, Ms. Begley called me into her office.  Ms. Begley said that Mr. Kutner was going to meet Mr. Keller at 5:30 p.m. in Mr. Kutner's conference room.  Ms. Begley stated once again that she intended to secretly tape record their conversation.  At approximately 2:15 p.m., Ms. Begley called me into her office and told me that she could not place the tape recorder in the conference room because her office was too far away, and that it would look suspicious if she was seen near the room.  Ms. Begley then asked me if I would be willing to place the tape recorder in the conference room on the bookshelf where it would not be seen.  I told Ms. Begley that I did not want to be involved, and did not want any trouble.  Ms. Begley proceeded to threaten to go to Mr. Kutner and tell him about some mistakes I had made on a file.  Ms. Begley then repeated her

request and asked me to place the tape recorder in the conference room as a personal favor to her. I agreed to do as Ms. Begley asked.

14.    Ms. Begley proceeded to show me the tape recorder, which was digital, and which was apparently capable of recording up to 4 hours of conversation. Ms. Begley showed me how to turn the tape recorder on and also instructed me how to delete portions of prior recordings so that I would have enough "tape" to record Mr. Kutner's and Mr. Keller's entire conversation.

15.    Ms. Begley said that she wanted to conduct a test run of the secret tape recording prior to Mr. Kutner's and Mr. Keller's meeting. Ms. Begley stated that employee Liz Cervantes, was scheduled to meet with one of Mr. Kutner's clients in the conference room in fifteen minutes, and she instructed me to secretly tape record their meeting.

16.    I then went to Mr. Kutner's conference room and placed the tape recorder between books on a bookshelf. I pushed the record button, and went back to my office awaiting the conclusion of Ms. Cervantes' meeting.

17.    Approximately 35 minutes later, Ms. Begley called me on my office phone from her office and informed me that Gabriella Perez conducted the client meeting instead of Ms. Cervantes. Ms. Begley said that she saw Ms. Perez leave the conference room, and instructed me to retrieve and listen to the recording to ensure that the recorder clearly picked up the conversation.

18.    I then went back to the conference room and closed the door. I retrieved the tape recorder and pushed the play button and heard Ms. Perez's voice. I then deleted the contents of the recording in order to free up space and record Mr. Kutner's and his attorney's meeting.

19.    While still in the closed conference room, I became nervous that the tape recorder would be discovered if it remained in between the books, so I moved the tape recorder above a

television set located in an armoir, pushed "record" on the tape recorder, and proceeded to secretly tape record Mr. Kutner's meeting with his attorney, Mr. Keller. I then went back to my office, and I left work for the day at approximately 5:15 p.m. that evening.

20. Later that night at about 8:30 p.m., I received a message on my telephone answering machine from Ms. Begley, asking me to call her immediately. Ms. Begley sounded panicked and upset. I immediately returned Ms. Begley's call. Ms. Begley said that she was at Mr. Kutner's office to retrieve the secret tape recording, but the tape recorder was not in the bookshelf where it was supposed to be. Ms. Begley said that she believed someone had discovered the tape recorder. I then informed Ms. Begley that I had moved the tape recorder to above the television set because I thought someone would see it between the books. Several moments later, Ms. Begley, sounding very relieved, said that she had located the tape recorder and was going home to listen to its contents.

21. While at work the next morning, Ms. Begley informed me that she had listened to the secret tape recording between Mr. Kutner and his attorney, Mr. Keller. Ms. Begley said that she had already talked to her attorney about the contents of the secret tape recording and that she was in the process of setting up a meeting with her attorney so he could listen to the tape recording. Ms. Begley stated that her attorney had advised her not to let anyone else listen to the tape. Ms. Begley also told me that she had informed her attorney that I placed the tape recorder in the conference room.

22. That same day, Ms. Begley said that she had lied to Mr. Donahue and told him that she had a doctor's appointment and would be out of the office for several hours, when in reality she was meeting with her attorney to listen to the secret tape recording.

23.     Several hours later Ms. Begley returned to work. I then observed Ms. Begley in the parking lot sitting in Patty Gutierrez's car talking. I walked up to Ms. Gutierrez's car where the window was rolled down and listened to their conversation. I heard Ms. Begley tell Ms. Gutierrez that her attorneys had listened to the secret tape recording between Mr. Kutner and his attorney. At that time, Ms. Gutierrez asked me if I was the one who put the tape recorder in the conference room, and I said yes. Ms. Begley told me that the tape recording contained the entire conversation between Defendant and his attorney addressing her claims. Ms. Begley then began boasting to me about the evidence that she had obtained from the secret tape recording of Defendant and his attorney, and that her attorney had advised her that they could win an enormous amount of money hands down. Ms. Begley also informed myself and Ms. Gutierrez that we would be able to obtain employment with her attorney at the law firm of Habbas & Bognar.

24.     Later that evening, Ms. Begley told Liz Cervantes, Portia Barlow, Veronica Gomez, and I about the secret tape recording that she and her attorneys had obtained. Ms. Begley boasted that her possible damages would not be capped and she could receive millions of dollars. Additionally, Ms. Begley told Ms. Gomez and I to come outside with her and listen to the secret tape recording which she had obtained. We proceeded outside of Mr. Kutner's office and listened to the tape. I heard Cindy Erickson discussing Ms. Begley's issues with Mr. Kutner's attorney, including settlement possibilities. I also heard Mr. Kutner conversing with his attorney regarding Ms. Begley. As soon as attorney David Fasset exited the building to where we were all standing, Ms. Begley stopped the tape.

25.     Shortly thereafter, Ms. Begley informed me that her attorneys had prepared a letter of resignation, and that her attorneys told her that she could present it to Mr. Kutner when

she was ready.  Ms. Begley told me that she intended to quit while I was on vacation in an attempt to cause Mr. Kutner problems with his collections.  I informed Mr. Kutner of Ms. Begley's intentions, and prior to my leaving on vacation, I prepared all of the pending accounts to avoid any problems in the event of Ms. Begley's departure.  Upon return from my vacation, I learned that Ms. Begley had submitted her resignation while I was away.

The foregoing is based upon my personal knowledge and if called to testify I could and would competently testify thereto.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __11 / 20 / _____, 2006                    By: _____
                                                              Christina Godoy

5

1          **AFFIDAVIT OF DANIEL MARKS, ESQ.**

2    STATE OF NEVADA                    )
                                        ) ss.
3    COUNTY OF CLARK                    )

4          I, Daniel Marks, being duly sword does depose and say the following:

5          1.    That I am a licensed attorney in the State of Nevada and licensed to practice in all State

6                and Federal Courts of Nevada.

7          2.    That I am the attorney for, Vikki Ralev, in the instant case.

8          3.    That I first met Vikki Ralev in late October when she was referred to me in connection

9                with the matter.

10         4.    That Vikki Ralev signed a retainer agreement with me at my office on October 25, 2006.

11         5.    That I had no knowledge of an alleged confidential tape recording until I received the

12               Defendant's motion on November 21, 2006.

13         6.    That I have not heard the contents of the confidential tape recordings.

14         7.    That I have never read any transcriptions of any confidential tape recordings.

15         8.    That I have never been informed of the contents of any confidential taped

16               communications by Ms. Begley, Ms. Ralev, or any other person.

17         9.    That I never instructed Ms. Begley to tape confidential communications.

18         10.   That I have never heard any taped communications recorded by Ms. Begley.

19         11.   That Habbas, Bognar & Associates have never informed me of any content of any

20               confidential tape recorded communications or the existence of any confidential tape

21               recorded communications.

22         FURTHER YOUR AFFIANT SAYETH NAUGHT.

23

24                                                    DANIEL MARKS, ESQ.

25   SUBSCRIBED and SWORN to before me
     this __19__ day of December, 2006.

26
     _____
27   NOTARY PUBLIC in and for said
     COUNTY and STATE

28

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
I. IRMA J. HARTS
No: 93-25211
My Appointment Expires Jan. 31, 2009